**Alfred FILESI, individually and trading as "Jolly Tavern," Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 9775.**

United States Court of Appeals Fourth Circuit.

Argued March 4, 1965.

Decided Oct. 29, 1965.

**340**

Stanley Scherr, Baltimore, Md. (Robert V. Lazzaro, Baltimore, Md., on brief), for appellant.

Robert H. Solomon, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Robert N. Anderson, Attys., Dept. of Justice, and Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, Asst. U. S. Atty., on brief), for appellee.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and LARKINS, District Judge.

BOREMAN, Circuit Judge.

The Commissioner of Internal Revenue, asserting that the Jolly Tavern located at Glen Burnie, Maryland, had been operated as a cabaret because dancing had been permitted to the music of a juke box,[1] assessed deficiencies in cabaret excise taxes, penalties and interest in the amount of $46,567.28 against the taxpayer, Alfred Filesi, based on the receipts from the operation of the tavern.[2] One assessment for the sum of $33,651.87, including penalties and interest was against Henry Muller, deceased, and Filesi, as partners, in the operation of the tavern for the period from the first quarter of 1954 through the first quarter of 1957. A second assessment in the amount of $12,915.41, including penalties and interest was against Filesi individually as sole owner of the tavern and covered the period from the second quarter of 1957 through the third quarter of 1958. Filesi paid $1,000 of the total assessment and brought this action in the District Court to recover that sum. The Government filed a counterclaim for the unpaid balance of $45,567.28.

In the District Court Filesi readily admitted that no excise tax returns had been filed for the periods covered by the assessments. He contended, however, that no excise tax was due and no returns were required because the Jolly Tavern had not been operated as a cabaret within the meaning of Section 4232(b) of the 1954 Code at any time as dancing had not been permitted, tolerated or regularly engaged in. Further, assuming the tavern was a cabaret, he contended that he was not liable for excise tax for the period from the first quarter of 1954 through the first quarter of 1956 as he was a "limited partner" during this period and did not become a general partner until a written partnership agreement was executed on April 4, 1956. Lastly, he contended below that the assessments, if proper, were inaccurate as the percentage of sales which the Commissioner found to be subject to tax was too high.

At the close of all the evidence the District Court ruled as a matter of law that Filesi was a general partner for the period in dispute. The remaining issues were then submitted to the jury by special interrogatories with the instruction that Filesi would be liable for any tax which the jury found to be due for the periods covered by the assessments. The jury found that there was dancing at the tavern and that the total tax liability for the entire period from 1954 through the third quarter of 1958 should have been

---

1. See, Section 4232(b) of the Internal Revenue Code of 1954 (26 U.S.C. § 4232(b)).

2. The assessments were made pursuant to Section 1700(e) of Internal Revenue Code of 1939 (26 U.S.C. § 1700(e)) and Section 4231(6) of Internal Revenue Code of 1954 (26 U.S.C. § 4231(6)).

$28,854.95 rather than the $46,567.28 assessed by the Commissioner. Judgment was accordingly entered.

The principal errors assigned on appeal relate to rulings of the court: first, that the court erred in ruling as a matter of law and instructing the jury that Filesi was a general partner for the period from the first quarter of 1954 through the first quarter of 1956; second, that it was error to permit Harvey Gold, an Internal Revenue Agent who was called as a witness by the Government, to testify as to statements made by Henry Muller to Gold during an interview in 1960;[3] finally, that the court erred in not allowing Filesi's counsel to cross-examine the witness Gold on the dancing issue.

In his testimony Filesi admitted he and Muller were partners but contended he was a "limited partner" and not liable for the tax for the periods before the second quarter of 1956. The facts upon which this contention is based are these. From 1949 when Filesi first became associated with the management of the Jolly Tavern until April 14, 1951, Filesi along with Muller and John Marshall were the only shareholders of a corporation organized to operate the tavern. Marshall wanted out of the business and on April 14, 1951, the corporation was dissolved and Muller assumed to purchase Marshall's interest but to do so Muller borrowed money from an outside source and the loan was subsequently repaid from the profits of the Jolly Tavern before Filesi and Muller received their shares as partners. The effect of this transaction was that Filesi became the purchaser of one half of Marshall's interest. According to Filesi, Muller did not have funds to buy Filesi's interest also so Muller persuaded him to leave his investment in the tavern. In return, Filesi testified, it was orally agreed that he was to manage the business at a stipulated salary and receive fifty percent of all profits but was not to be liable for any losses. The liquor license was transferred to Muller's name and the business was operated under this arrangement un-

til April 4, 1956. On that date Muller and Filesi executed a written partnership agreement under which both were to share gains and losses equally. From April 4, 1956, to April 4, 1957, the tavern was operated under this written agreement. On the latter date the partnership was dissolved and Muller sold his interest to Filesi who has since owned and operated the tavern.

Filesi argues that he was a limited partner from April 14, 1951, to April 4, 1956, and as such he was not liable for any losses of the partnership during this period; that, as the excise tax from the first quarter of 1954 through the first quarter of 1956 would constitute a loss he should not be held accountable for the tax. We cannot agree. It is well settled that to obtain the protections and privileges of limited liability a person must comply with the statutory requirements regulating the formation of limited partnerships or otherwise be held liable as a general partner. 40 Am.Jur., Partnerships § 506. Article 73 of the Annotated Code of Maryland specified the acts which must be performed by a person desiring to become a limited partner in the operation of a business within that State. It was clearly shown that Filesi did not comply with these provisions and, therefore, he cannot now claim the protection of a limitation of liability. It is clear from the evidence generally and from Filesi's own testimony that he openly and publicly took an active part in the management and control of the business. We think the District Court was correct in holding as a matter of law that Filesi was liable as a general partner for any excise tax properly assessed for the period in dispute.

Even assuming that Filesi was a limited partner his argument is unsound. According to applicable law a limited partner is liable for any losses of the partnership to the extent of his investment in the assets of the business. On this point, however, no evidence was produced to show what Filesi's investment

---

3. Muller was deceased at the time of trial.

was for the period although in 1951 it was slightly in excess of $10,000.

■ At trial the dancing issue was a highly controverted one which the jury resolved in the Government's favor. On this issue the trial court permitted Gold, a witness called by the Government, to testify as follows:

"Q. Would you tell the Court and jury the statements made by Mr. Muller concerning dancing?

"A. Mr. Muller stated that throughout this period of time, he was operating the Jolly Tavern and that during this period of time, there was juke box dancing as a general mode of business or operation of the business throughout the period. Insofar as the dancing was concerned, it was to the juke box.

"Q. Did he mention anything about dancing signs, 'No dancing' signs?

"A. Yes, he did. He mentioned that at times, there were 'No dancing' signs that were posted but there was never anything done as far as to stop the dancing was concerned, but this was just the mode of operation. There was dancing as the entertainment.

"Q. Did he make any statements regarding the frequency of dancing?

"A. Yes, he did. He stated that the dancing occurred most every time a crowd congregated at the Jolly Inn and that normally, the crowd would congregate on the weekends, which would be Friday, Saturday and Sunday and after your supper hours, which would be approximately 6:00 p. m. on until the close of business."

Filesi objected to this testimony on the ground that it was hearsay because Muller was not a party to the action and the statements were made in March of 1960, approximately three years after the partnership between him and Muller had been dissolved. The Government contends, however, that Muller's statements were admissible either as admissions against the partnership or as declarations against Muller's pecuniary interest. We conclude that these statements were inadmissible under either of these theories.

Professor Wigmore states that whether or not the statements of a partner are admissible as admissions against the other partners depends upon the substantive law of Agency as applied to partnerships. 2 Wigmore on Evidence § 1078 at p. 589 (2d ed. 1923). See also, Local Union No. 787 v. Collins Radio Co., 317 F.2d 214 (5 Cir. 1963); Flintkote Co. v. Lysfjord, 246 F.2d 368 (9 Cir. 1957). Under applicable substantive law a partner is an agent of the partnership for the purpose of performing acts in connection with the conduct of the partnership business. Consequently, it is generally agreed that statements made by a partner during the life of the partnership and in connection with the conduct of the firm's business are admissible in evidence as admissions against the other members of the partnership even though the declarant is not a party to the action. 31A C.J.S., Evidence § 365 (1964); 73 A.L.R. 447, 449 (1931). Once the partnership has been dissolved and the agency relationship thereby terminated, there is a division of authority on the question of whether the statements of one partner, made after the dissolution of the partnership and relating to past partnership transactions, are admissible against the other partners as admissions. 31A C.J.S., Evidence § 365 (1964); 73 A.L.R. 447, 459 (1931); 40 Am.Jur., Partnership § 276 (Repr.1960); see also, McCormick on Evidence § 244 (1954), and 1 Jones on Evidence § 250 (4th ed. 1938). Some courts recognize a continuing power in a partner to bind the other members of the firm by statements made subsequent to the dissolution which relate to past partnership transactions. Other courts hold that statements made by a partner after the partnership has been dissolved and not connected with the winding up of the partnership affairs, although they relate to past partnership transactions, are not admissible as admissions against the other members of the partnership.

This latter view has been labelled the rule of the majority. 73 A.L.R., supra; 40 Am.Jur., supra; 31A C.J.S., supra. The reason for the "majority rule" is succinctly stated in 40 Am.Jur., Partnership § 276:

" * * * This rule, it is reasoned, is best adapted to the security of private rights. While former members of a dissolved partnership may each receive and release debts due the partnership and apply assets to the liquidation of firm debts, the power vested in one partner to bind other members of the partnership by the creation of new liabilities and obligations falls with the partnership. To recognize admissions of one partner, made after the partnership has no existence, as admissions binding the partnership, involves recognition of the power to bind all by the creation of a partnership liability. Moreover, if members of a dissolved firm could by admissions charge their former partners, not only might the partnership assets be swallowed up, but the individual members of the late firm might be made bankrupt by admissions made after the partnership has ceased to exist by one no longer their agent."

Thus the courts in the majority recognize that a partner has the authority to bind the other members of the firm by statements made after dissolution of the partnership *only when the statements are made while in the process of winding up the partnership affairs*. This is the same position taken by McCormick on Evidence § 244 (1954).

Applying to the present fact situation the majority rule, which we favor, we think Muller's statements to Gold were inadmissible as admissions against Filesi. The statements were made approximately three years after the partnership had been dissolved and not during the winding up of partnership affairs. We find no statute or rule of either the United States or Maryland which would compel the admission of this evidence. Both Maryland and the federal courts appear to follow the majority rule as stated above although the cases on the specific question are old. See Thompson v. Bowman, 73 U.S. 316, (6 Wall.) 316, 18 L.Ed. 736 (1867); In re Malschick, 217 F. 492 (E. D.Pa.1914); Newman v. McComas, 43 Md. 70 (1875); Owings v. Low, 5 Gill & J. 134 (Md. 1833). Cf. Seldner v. Mount Jackson Nat. Bank, 66 Md. 488, 8 A. 262 (1887). Nothing in Rule 43(a) F.R. Civ.P., as we construe it, requires the federal court to follow the minority view of a number of states other than Maryland as to the admissibility of Gold's testimony concerning Muller's statements.

■ Although declarations made by a person against his pecuniary or proprietary interest are admissible whenever relevant no matter what the relationship is between the declarant and the party against whom the statements are offered,[4] we do not think Muller's statements to Gold were admissible under this exception to the hearsay rule. The basis for the declaration against interest exception is that a statement made by an individual against his interest would not be made unless truth compelled it and it is this element of trustworthiness which compensates for the absence of the oath and the opportunity for cross-examination. 3 Wigmore on Evidence §§ 1457 and 1475 (2d ed. 1923). It is implicit in the exception that for the declaration to be trustworthy the declarant must have known it was against his interest at the time he made the statement. As stated by Jefferson in 58 Harv.L.Rev. 1, 17 (1944):

" * * * (I)t is not the fact that the declaration is against interest but the awareness of that fact by the declarant which gives the statement significance. * * * "

4. Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule, 58 Harv.L.Rev. 1, 63 (1944); 31A C.J.S. Evidence § 217 (1964); 20 Am.Jur., Evidence §§ 544 and 556 (Repr.1958); 1 Jones on Evidence § 323 (4th ed. 1938).

The rule is stated in 31A C.J.S., Evidence § 222 as follows:

"In order for a declaration to be admissible as a declaration against interest, it must clearly appear that the statement of declarant was actually against his interest, *and known or believed to be so,* at the time it was made; otherwise the statement will not be admitted." (Emphasis added.)

Although Muller's statements that dancing was permitted at the Jolly Tavern were against his pecuniary interest, there is nothing to indicate he was aware of this fact at the time the statements were made. The witness Gold stated that he spoke with Mr. Muller on two occasions at his office in March of 1960. According to Gold he informed Muller of his rights. The following is Gold's testimony on this point:

"Q. (The Court) What was the nature of the statements which you made?

"A. (Gold) The nature of the statements was to explain to Mr. Muller that he was a partner with Mr. Filesi in the Jolly Tavern and that we were after the—actually the facts inasfar as the operation was concerned, *and that any developments as such would be used in developing* the cabaret tax liability against him, as well as Mr. Filesi." (Emphasis added.)

There is nothing in Gold's testimony or in the testimony of any other witness to clearly indicate that Muller was made aware of or realized the possible serious financial consequences to him which could arise from his admission that dancing was permitted at the tavern. There is no showing that Muller knew that dancing at the tavern would transform it into a "cabaret" and create a liability for excise taxes where no such liability would otherwise exist. These damaging statements by Muller could have been made during a general conversation with Gold about some other phase of the business operation and without the realization that his statements concerning dancing might create a personal liability for the payment of excise taxes.

We are of the opinion that the effect of this inadmissible evidence on a hotly contested issue was clearly prejudicial and that Filesi is entitled to a new trial. Gold's testimony went to the heart of the case and for the Government to argue that it was not prejudicial is to ignore reality.

In view of our disposition of the case we do not reach the other assignment of error based upon the restricted cross-examination of Gold on the dancing issue.

Reversed and remanded for a new trial.