IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-5568

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID M. SAKS,

Defendant-Appellant,

_____

No. 91-5572

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES DOYLE SPRUILL,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Western District of Texas

_____

(June 23, 1992)

Before WILLIAMS, JOLLY, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

A jury convicted Doyle Spruill and David Saks on one count of conspiracy to defraud the United States, 18 U.S.C. § 371, and five counts of bank fraud, 18 U.S.C. § 1344. Spruill and Saks challenge the jury instructions and the sufficiency of the evidence. Saks also argues that the court erred in admitting testimony of Spruill given in a deposition in a civil suit, contrary to the

Confrontation Clause of the Sixth Amendment.  Both defendants also contend that their convictions on the bank fraud counts were multiplicitous.  We find that the evidence was sufficient and that any error in the jury instructions was harmless beyond a reasonable doubt.  We also find that Spruill's testimony given in the deposition was properly admitted.  Finally, we find the bank fraud counts multiplicitous under the rule set forth in United States v. Lemons, 941 F.2d 309 (5th Cir. 1991), and remand with instructions to vacate these convictions and resentence on one of them.

I.

Spruill and Saks were business partners in Omni Interests, Inc., a commercial real estate development company, based in San Antonio.  Omni specialized in the development of office buildings, shopping centers, and apartment projects in different locations throughout Texas.  In 1983, Spruill and Saks formed a limited partnership, Omni/Corpus Christi Limited, to acquire and develop a large tract of land in Corpus Christi.  They purchased the property for $3 million in 1984 as a location for a large shopping center. They had the property rezoned and began negotiations with major mall developers.  By year end, however, Omni had financial problems.  Spruill and Saks needing cash for the company's short term financial obligations, decided to borrow, with the Corpus Christi property as collateral.

They approached Peoples Savings & Loan Association, where officials informed them that they would need about $14 million to pay existing debt on the property and keep their company afloat.

2

Peoples could not handle a loan of that size, and referred them to Security Savings Association. That was a fateful day. In December of 1984, Spruill and Saks met with Cliff Brannon and Don Jones, co-chairmen of the board of Security and owners of a controlling interest in it. They asked Brannon and Jones for a loan of $14 million. They had obtained an appraisal valuing the property at $24 million, based on its potential as a site for a regional shopping mall. Brannon and Jones listened and promised to let them know soon. The prospective lender, it seems, saw in this prospective loan a solution to its own unrelated but serious problem.

The year before, Security had loaned Ray Stockman about $20 million to develop Chaucer Village, a condominium project in Dallas. When Saks and Spruill walked in, Chaucer Village had failed. Officials of the Federal Home Loan Bank Board had determined that the Chaucer Village loan had been "overfunded" by about $5 million. The Board had directed Brannon and Jones either to write down the loan, that is, to establish a loss reserve against the overfunded amount, or cover it with new capital. Without an infusion of funds from some outside source, Brannon and Jones would effectively be out of business or under supervisory control, since Security's net worth would fall below the minimum regulatory requirements. They did not have the money.

Brannon and Jones explained to Stockman that Spruill and Saks had requested a $14 million loan, but that by lending $19 million, with Stockman as a business partner, Saks and Spruill could pay

Stockman $5 million of the loan proceeds. Stockman would then pass the $5 million to Security for the troubled Chaucer Village loan. Stockman's name would not appear on any loan documents, hiding from federal regulators the tied transactions. In short, the proposal was a shuffle of the $5 million debt from Stockman and the Chaucer Village project, in which the regulators were keenly interested, to Spruill and Saks and the Corpus Christi project, where there was no apparent impropriety. There would be no real infusion of capital, since the source of the funds to cover the Chaucer Village loan would originate with Security itself. The transaction would create the appearance of such an infusion, however, so as to placate the FHLBB.

Brannon and Jones persuaded Stockman with the suggestion that he would receive no further funding absent his help. The two bankers then told Spruill and Saks that the loan came with Stockman as a partner and the $5 million added would never leave the bank but would flow through Stockman to Security. They explained the Chaucer Village loan and why Stockman could not appear on any of the paper work. Spruill and Saks objected at first, but succumbed. Spruill later said that he felt that their backs were against the wall and they would lose everything they had if they did not agree to the deal.

So then, on January 14th of 1985, Omni/Corpus Christi borrowed $19 million from Security and two closely affiliated banks, Meridian Savings Association and Peoples Savings and Loan

4

Association.[1]  The Corpus Christi property was pledged as collateral.  Spruill and Saks signed a loan agreement reciting that the loan was for the sole benefit of the lender and borrower and was not for the benefit of any third party.  Stockman's name was not on any of the closing documents.  Robert Brown, Meridian's attorney and the preparer of the closing documents, later said that he was completely unaware of Stockman's role.  The same day, Spruill, Saks, and Stockman formed Crosstown Joint Venture to develop the Corpus Christi property.  At the insistence of Spruill and Saks, Stockman also signed a separate guaranty of the $19 million that Omni/Corpus Christi had borrowed.

A few days later, Spruill took $5 million of the loan proceeds and made out a cashier's check to Stockman for this amount, ostensibly for his services as an "advisor" in Crosstown Joint Venture.  Stockman rendered no such services.  Spruill gave the check to Jones, who met with Stockman, gave him the check, and had him purchase a certficate of deposit in the name of his company, Condo Homes Corporation.  Condo Homes then wired the money to Security to pay down the Chaucer Village loan.  Security informed federal regulators that a purchaser had been found to take over Chaucer Village and pay off the loan, but did not disclose the true source of the funds.  With the shuffle complete, Omni was left to carry a $19 million debt, over 25% of which it had never received.

---

[1]    The principals at Security, Meridian, and Peoples were involved in a web of personal loans to each other and often acted in concert in financial transactions.

In 1986, Meridian sued for foreclosure on the Corpus Christi property. Spruill and Saks counterclaimed against Meridian, Security, and Peoples, asserting that the loan was usurious. They argued that part of the loan transaction was a sham, since $5 million was not in fact loaned to Omni/Corpus Christi but was diverted to Security for Stockman's debt. Crosstown Joint Venture was merely an artifice conceived by Security to hide the true nature of the relationship between Spruill, Saks, and Omni/Corpus Christi on the one hand, and Stockman on the other. Spruill and Saks signed pleadings detailing the fraudulent nature of the loan arrangement, and Spruill testified at length about the transaction in depositions.[2] Spruill and Saks ultimately won a settlement in this lawsuit dissolving the Omni note and requiring the banks to pay them approximately $2 million.

In 1990, the government indicted Saks and Spruill on charges of conspiracy to defraud the United States and aiding and abetting bank fraud.[3] There were two theories: first, that they defrauded federal regulators by concealing Stockman's involvement in the loan transaction, and second, that they defrauded the banks of their money. Saks testified in his defense at trial. Spruill did not but the court admitted Spruill's deposition testimony from the civil suit into evidence. The jury found both defendants guilty on

---

[2] Saks was present during at least part of these depositions.

[3] Brannon, Jones, and Ron Hertlein, the President of Security, were also indicted. They all pled guilty. We are not aware whether Stockman was prosecuted.

five counts of bank fraud, 18 U.S.C. §§ 2, 1344, and one count of conspiracy to defraud the United States, 18 U.S.C. § 371.

## II.

Spruill and Saks were convicted under § 1344(1), which punishes the knowing execution or attempted execution of "a scheme or artifice to defraud a federally chartered or insured financial institution." 18 U.S.C. § 1344(1). The term "scheme to defraud" is not readily defined, see United States v. Goldblatt, 813 F.2d 619, 624 (3rd Cir. 1987), but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived. United States v. Lemons, 941 F.2d 309, 314-15 (5th Cir. 1991); United States v. Church, 888 F.2d 20, 23 (5th Cir. 1989). The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself. United States v. Gunter, 876 F.2d 1113, 1120 (5th Cir. 1989); United States v. St. Gelais, 952 F.2d 90, 96 (5th Cir. 1992) (wire fraud).

Spruill and Saks argue that there was insufficient evidence of their specific intent to defraud the banks. They contend that it is undisputed that all parties to the loan transaction, the putative victims as well as those accused, knew of Stockman's role; that there was no effort to conceal Stockman from bank officers. Indeed, it was Brannon and Jones, officers and directors of Security, who insisted that Stockman be left off of the closing

7

documents. In defendants' view, the evidence established at most that they intended to defraud federal regulators, because the banks were not victims but participants.

We are not persuaded. It is the financial institution itself--not its officers or agents--that is the victim of the fraud the statute proscribes. United States v. Briggs, 939 F.2d 222, 225 (5th Cir. 1991); United States v. Blackmon, 839 F.2d 900, 904-06 (2d Cir. 1988); S. Rep. No. 225, 98th Cong., 2nd Sess. 377 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3517 (§ 1344 was "designed to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions that are federally created, controlled, or insured."). Thus bank officers with authority to bind their banks to others can nevertheless defraud the institutions they serve. See, e.g., United States v. Lemons, 941 F.2d 309, 317 (5th Cir. 1991); United States v. Hooten, 933 F.2d 293, 295 (5th Cir. 1991) (upholding convictions of bank officers under § 1344 for fraudulent conduct). It follows that bank customers who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors.[4] Section 1344 was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system. See S. Rep. No. 225, supra.

---

[4] Spruill and Saks were charged under 18 U.S.C. § 2, which punishes those who aid or abet criminal offenses as principals. If Brannon and Jones wre guilty of bank fraud, Saks and Spruill could be punished for aiding and abetting them in this offense.

8

Spruill and Saks defrauded the banks by falsely representing on loan documents who the true recipients of the Corpus Christi loan were and for what purposes the funds would be used. They concealed Stockman's involvement from the financial institutions. Brannon and Jones were aware of the fraud, indeed it was their idea, but this does not mean that the banks were not defrauded. Courts have on several occasions concluded that if a borrower obtains funds at the insistence of and for the benefit of a bank officer, without disclosing the officer's interest on the loan documents, thereby knowingly flouting banking rules and regulations designed to protect the financial integrity of the bank, a jury can conclude that both borrower and officer acted with intent to defraud the bank. See United States v. Castiglia, 894 F.2d 533, 536-38 (2d Cir. 1990); United States v. Walker, 871 F.2d 1298, 1306-07 (6th Cir. 1989); United States v. Shively, 715 F.2d 260 (7th Cir. 1983).[5] This case is similar in its essentials. Spruill and Saks knowingly assisted Brannon and Jones in flouting a directive of the FHLBB designed to protect the financial integrity of the bank. By helping Brannon and Jones evade the write down of the Chaucer Village loan, they perpetuated the very financial risk the Board sought to prevent. They not only put Security in jeopardy of a loss, but also brought about their own financial gain by obtaining a loan that they otherwise could not have obtained.

[5] Although these cases for the most part involve misapplication of bank funds under 18 U.S.C. § 656, both § 656 and § 1344 require proof that the defendant intended to defraud or injure a bank, see Walker, 871 F.2d at 1305 n.6, which is the element at issue here.

This constitutes an intent to defraud within the meaning of § 1344(1).

Defendants also contend that they could not have committed bank fraud because the loan they obtained was amply secured, and they assumed a legal obligation to repay it. They maintain that under these circumstances, any omissions concerning Stockman's involvement were simply not material. We disagree. The fraudulent loan transaction plainly exposed Security and the other lenders to a risk of loss, which is all that is required under § 1344. Lemons, 941 F.2d at 316 n.3; United States v. Solomonson, 908 F.2d 358, 363-64 (8th Cir. 1990). Even if we were to assume that the Corpus Christi property was worth its appraised value of $24 million because of its potential use as a shopping mall, a proposition disputed by the government at trial, this does not mean that banks would generally be willing to loan this amount up front with undeveloped land as the sole security. The jury was entitled to conclude that this refinancing of undeveloped property based on speculative future development entailed high risk. Indeed, the fact that Spruill and Saks had to go along with Brannon and Jones' scheme is a strong indication that the risk involved in the Corpus Christi loan was not one that most banks would have accepted. If it were, Spruill and Saks could have shopped the property to other lenders. Instead, they had their backs against the wall and agreed to take on $5 million of additional debt to obtain the funds they needed. Spruill conceded as much in his civil deposition testimony. The jury could reasonably conclude that the quid pro

10

quo for agreeing to participate in the fraud was the lenders' ready accession to a suspect loan request, no questions asked. Whereas before the transaction Security had a $5 million troubled loan outstanding, afterwards they had a dubious $8.3 million loan, and Meridian and Peoples also had loans totaling more than $10 million. Saks and Spruill helped Brannon and Jones dig Security deeper into a financial hole, and they were taking Meridian and Peoples with them. The misrepresentations and omissions were then material; they were the driving force behind the entire transaction.

Defendants also argue that their convictions must be reversed because they relied in good faith on the advice of counsel in agreeing to the loan transaction. This argument is without merit. The district court properly instructed the jury on the advice of counsel defense, see Williamson v. United States, 207 U.S. 425, 453 (1908). Defendants cannot insulate themselves from criminal prosecution by the presence of a lawyer, even if he knows what is going on.

### III.

The district court instructed the jury that the government had to prove beyond a reasonable doubt that defendants knowingly devised and executed or attempted to execute a scheme or artifice to defraud a federally chartered or insured financial institution to convict under § 1344. It explained that the term scheme or artifice to defraud includes any plan or course of action intended "to deceive others in order to obtain something of value such as money from the institution to be deceived" or "to deprive a

11

federally insured financial institution of the intangible right to honest services."  Spruill and Saks argue it was error to instruct on intangible rights because when they borrowed the $19 million, § 1344 applied only to frauds involving money or property, not those involving an intangible right to honest services.

In McNally v. United States, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute, 18 U.S.C. § 1341, reached only fraudulent schemes involving property rights, not those involving intangible rights to good government.  This holding has been applied retroactively to reverse convictions under the mail and wire fraud statutes that were based on an intangible rights theory.  United States v. Marcello, 876 F.2d 1147, 1153 (5th Cir. 1989); United States v. Huls, 841 F.2d 109, 111-12 (5th Cir. 1988).  In 1988, Congress responded to the McNally decision by enacting § 1346, which provides that "scheme or artifice to defraud" includes a scheme to deprive another of the intangible right of honest services.  18 U.S.C. § 1346.  This statute is not to be applied retroactively.  United States v. Loney, (No. 91-1340) (5th Cir. Slip Op. April 23, 1992) at 4281 n.6; United States v. Little, 889 F.2d 1367, 1369 (5th Cir. 1989).  Thus for conduct before the enactment of § 1346, defendants cannot be convicted of mail fraud on the theory that they deprived someone of an intangible right to honest services.

Our first question is whether McNally's interpretation of the mail fraud statute extends to the bank fraud statute as well.  It is well settled that Congress modelled § 1344 on the mail and wire

12

fraud statutes, and that the usual practice is to look to precedents under those statutes to determine its scope and proper interpretation. See H.R. Rep. No. 901, 98th Cong., 2nd Sess. 2 (1984); S. Rep. No. 225, 98th Cong., 1st Sess. 377 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3519; United States v. Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992); United States v. Solomonson, 908 F.2d 358, 364 (8th Cir. 1990); United States v. Bonallo, 858 F.2d 1427, 1432-33 (9th Cir. 1988). In the usual case, there would be little question that the Court's interpretation of § 1341 would also hold true for § 1344. Indeed, the government has conceded that McNally applies here.

We are not quite so ready to endorse this position as the parties are, however. This bank fraud statute was enacted in 1984, at a time when the unanimous view of the mail and wire fraud statutes in the lower courts was that they encompassed schemes to defraud others of intangible services as well as property. See McNally, 483 U.S. at 362-63, nn.1-5 (Stevens, J., dissenting) (citing cases). Congress was well aware of the courts' interpretation of these statutes when it adopted them as its model. Indeed, the House Judiciary Committee in considering the proposed bank fraud statute expressly noted the history of expansive interpretations of the meaning of "scheme to defraud" in §§ 1341 and 1343, albeit with some concern. It stated that "the current scope of the wire and mail fraud offenses is clearly greater than that intended by Congress. Although the Committee endorses the current interpretations of the language, it does not anticipate any

13

further expansions." H.R. Rep. No. 901 at 4.  When Congress enacted § 1344, it anticipated that the provision would be given the same broad construction that the mail and wire fraud statutes had been given to that point.  McNally was decided three years later and was an abrupt reversal of the well entrenched judicial construction of § 1341.  Thus there is an argument that we should interpret § 1344 in light of the case law on §§ 1341 and 1343 as it existed in 1984, rather than considering the turnabout that occurred later.[6]

We need not decide this issue here, however, because even if we assume that McNally does apply to § 1344, and that the court's instruction was therefore erroneous, we find the error harmless. This court and others have considered McNally error on many occasions, and have found the error reversible or harmless depending on the facts of the case.  Compare Marcello, 876 F.2d at 1153; Huls, 841 F.2d at 111-12; United States v. Lew, 875 F.2d 219, 221-22 (9th Cir. 1989); United States v. Ochs, 842 F.2d 515, 525-27 (1st Cir. 1988); United States v. Shelton, 848 F.2d 1485, 1496-97 (10th Cir. 1988); United States v. Zauber, 857 F.2d 137, 144-48 (3d Cir. 1988); United States v. Mandel, 862 F.2d 1067, 1072-74 (4th Cir. 1988) (reversing on the basis of McNally error) with United States v. Richerson, 833 F.2d 1147 (5th Cir. 1987); United States v. Fagan, 821 F.2d 1002, 1010-11 (5th Cir. 1988); United States v.

---

[6]     As in the case of the mail fraud statute, this problem only arises with respect to bank fraud that occurred before the enactment of § 1346 in 1988.  For conduct after this point, a scheme or artifice to defraud a financial institution includes a scheme involving intangible rights to honest services.  United States v. Hooten, 933 F.2d 293, 296 (5th Cir. 1991).

14

Madeoy, 912 F.2d 1486, 1492-93 (D.C. Cir. 1990); United States v. Asher, 854 F.2d 1483, 1487-96 (3d Cir. 1988); United States v. Doherty, 867 F.2d 47, 57-60 (1st Cir. 1989); United States v. Moore, 865 F.2d 149, 152-54 (7th Cir. 1989); United States v. Messinger, 872 F.2d 217, 224 (7th Cir. 1989) (finding McNally error harmless).  The Third Circuit has explained that "[a]lthough the outcomes in the post-McNally cases . . . vary depending on the facts, indictments, and jury instructions of the particular case, a common thread running through each of these cases can be discerned. . . . [T]hose cases that have sustained mail fraud convictions [despite McNally error] have done so where the "bottom line" of the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state."  Asher, 854 F.2d at 1494.  We think this formulation of the standard is sound.  It reflects the idea expressed more generally by the First Circuit that "[a]n erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element."  Doherty, 867 F.2d at 58; see also Pope v. Illinois, 481 U.S. 497 (1987); Rose v. Clark, 478 U.S. 570 (1986).

We are persuaded that the scheme or artifice proved at trial had the inevitable result of defrauding the banks of property interests.  The only reason Spruill and Saks participated in the plan was to obtain a loan which they otherwise could not have

15

obtained. Security was deprived of the honest services of Brannon and Jones in the process, but this was incidental to the scheme to procure funds by whatever means necessary. We cannot conceive of how the jury could have found that Spruill and Saks intended to defraud the lenders of the honest services of their officers without also concluding that they knowingly exposed them to a risk of financial loss. This risk inhered not only in the $19 million Omni loan but also in the fact that the defendants helped Brannon and Jones evade a write down of the Chaucer Village loan which was necessary to maintain the financial integrity of the institution. The jury's guilty verdict on the bank fraud count reflects a reasoned judgment that Spruill and Saks participated in the scheme with full knowledge not only that bank employees were acting dishonestly, but also that the scheme had _financial_ consequences for the banks.

Defendants did not object to the intangible rights instruction at trial. They must demonstrate error "'so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of the judicial proceedings and result in a miscarriage of justice." _Richerson_, 833 F.2d at 1147 n.26; _see also_ _Madeoy_, 912 F.2d at 1493. We cannot find such an unfairness or miscarriage of justice. The government presented substantial evidence of Security's loss of money at trial. Indeed, defendants were not indicted on the theory that they defrauded Security and the other banks of the intangible right to the honest services of their employees. Nor was this argument pressed at

16

trial.   Rather, "the overriding and predominate theory of the government's case" on the bank fraud counts involved the lenders' loss of money.   See Richerson, 833 F.2d at 1157.   Under these circumstances, it is less likely that a single potentially erroneous jury instruction had a substantial impact on the jury's decision.

Spruill and Saks also argue that the court erred in instructing the jury on the conspiracy count.[7]  The court told the jury that the government had to prove beyond a reasonable doubt that two or more persons agreed to defraud the Federal Home Loan Bank Board or the bank, as charged in the indictment.   The court explained the standard elements of a conspiracy.   Defendants argue that this instruction did not adequately define what it means to defraud the Federal Home Loan Bank Board; that the district judge gave inadequate guidance, and the jury may have filled the instructional vacuum with an improper definition.

We are not persuaded.   Defendants did not object to the conspiracy instruction at trial, so that we review only for plain error.   See Richerson, supra.   Furthermore, because defendants' claim of prejudice is based solely on the failure to give adequate explanation of the offense--beyond the reading of the statutory language itself--their burden is especially heavy.   Henderson v.

---

[7]     "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."  18 U.S.C. § 371.

17

Kibbe, 431 U.S. 145, 155 (1977).  We are generally not inclined to reverse on the basis of instructions which accurately state the law and to which there was no objection simply because the court did not provide more guidance as to the meaning of the offense.

Here, the court described the elements of a conspiracy and properly stated the objects of the conspiracy as either defrauding the Federal Home Loan Bank Board or committing bank fraud.  Although the court did not explain what it meant to defraud the Board, it did read the jury the indictment, which explained this object as "to hamper, hinder, impede, impair and obstruct by craft, trickery, deceit, and dishonest means, the lawful and legitimate functions and responsibilities of the Bank Board in regulating, examining, and supervising the activities of Meridian, Security, and Peoples."  The government accurately explained the meaning of this offense at length in closing argument.  We must consider this surrounding context in determining whether the court's instruction was likely to have confused the jury.  United States v. Chagra, 807 F.2d 398, 402-03 (5th Cir. 1986).  On this record, we see no danger of confusion, certainly none that rises to the level of plain error.

Spruill and Saks also argue that the district court erred in failing to give a cautionary instruction concerning a civil banking regulation that was mentioned at trial.  A savings and loan examiner named James Hinman testified at trial about the general role of examiners in overseeing savings and loans, the problems that can arise with loans, how loan examiners evaluate loan

18

documents, and how they respond to bad or overvalued loans. Hinman referred to a regulation "that requires that the institution show the ultimate recipient of all of the loan proceeds." He mentioned the regulation a few times in the course of his testimony and cross-examination. Defendants contend that there was a substantial danger that the jury based their convictions on violation of this civil regulation rather than the criminal offenses with which he was charged. They rely primarily on United States v. Christo, 614 F.2d 486, 492 (5th Cir. 1980), where we held that a conviction resulting from the government's attempt to bootstrap violations of a civil regulation into a criminal offense cannot be allowed to stand.

Defendants did not request a cautionary instruction at trial. If error at all, and we do not suggest that it was, the failure to instruct the jury on the effect of the civil regulation was not plain. Unlike Christo, the government did not base its case on Spruill and Saks' violations of any banking regulation. Neither the indictment nor the court's instructions to the jury referred to a civil regulation, as they did in Christo. Nor did the government argue that violation of a civil regulation was proof of defendants' guilt.

This case is closer to United States v. Stefan, 784 F.2d 1093, 1098 (11th Cir. 1986), where the Eleventh Circuit held that if evidence of civil violations is introduced for purposes other than to show a criminal violation, and the evidence is not presented in such a way that the jury's attention is focused on the civil

violations rather than the criminal ones, there is no error. The limited references to banking regulations that occurred at trial served to explain to the jury the role of federal regulators in overseeing savings and loans. The government would be hard pressed to prove that defendants defrauded federal regulators without mention of the regulations these officials are responsible for enforcing. It would also be difficult to explain the stakes in a bank fraud case without some reference to the rules by which these institutions are governed. The regulation played at most a minor role at trial. We do not think it "impermissibly infected the very purpose for which the trial was conducted," Christo, 614 F.2d at 492, and hence does not give us cause for reversal.

We have considered defendants' other contentions with respect to the court's jury instructions. None of these objections were raised at trial. Whatever their merit, we do not think they rise to the level of plain error.

IV.

Saks argues that the district court erred in admitting Spruill's prior deposition testimony from the civil suit. Spruill made incriminating statements about the fraudulent nature of the Omni loan at several depositions in 1986 in an effort to show that the loan was usurious. He did not testify at the criminal trial, however. Saks contends that this evidence was hearsay, and that its introduction violated his Sixth Amendment right to confrontation under the rule of Bruton v. United States, 391 U.S. 123 (1968).

20

The district court considered this objection and concluded that Spruill's deposition testimony was admissible against Saks under Federal Rule of Evidence 801(d)(2)(D).  This rule says that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  The court reasoned that Spruill and Saks were partners and thus agents for each other.  Spruill's testimony related to matters within the scope of his agency as general partner of Omni, and as such was admissible under Rule 801(d)(2)(D).  Because Spruill's deposition testimony was legally considered an admission by Saks, the court found that <u>Bruton</u> did not apply.

First, we must consider whether Spruill was Saks' agent for the purposes of Rule 801(d)(2)(D).  Because the rule does not define "agent," we assume Congress intended to refer to general common law principles of agency when it used the term.  <u>Community for Creative Non-Violence v. Reid</u>, 109 S.Ct. 2166, 2172-73 (1989); <u>Boren v. Sable</u>, 887 F.2d 1032, 1039 (10th Cir. 1989).  There was some ambiguity at common law as to whether a partner is an agent of his co-partners or of the partnership as an abstract entity.  <u>See</u> Crane & Bromberg, <u>Partnership</u> 274 (1968).  The Uniform Partnership Act, adopted in Texas and most other states, has endorsed the entity view.  See UPA § 9 ("Every partner is an agent of the partnership for the purpose of its business.").  Regardless of which is the better characterization, the general rule at common

21

law was that the declarations of one partner made during the existence of the partnership and in relation to its affairs are admissible against the other partners even if the declarant is not a party to the action. Filesi v. United States, 352 F.2d 339, 342 (4th Cir. 1965). We have no reason to believe that Congress departed from this rule when it enacted the Federal Rules of Evidence in 1975. Moreover, courts have held that we should not be hyper-technical in construing the agency relationship of Rule 801. See United States v. Paxson, 861 F.2d 730, 734 (D.C. Cir. 1988) (finding the vice president of a corporation to be an agent of the president for the purposes of 801(d)(2)(D) because the factors which normally make up an agency relationship were present). Spruill and Saks were the general partners of Omni/Corpus Christi Ltd., and they acted in concert in managing its affairs. We are confident that they were agents for each other for the purposes of Rule 801(d)'s agency exception. Cf. Anderson v. United States, 417 U.S. 211, 218 n.6 (1974) (conspiracy exception to hearsay rule is rooted in the notion that conspirators are "partners in crime" and hence agents of one another).

Next we ask whether Spruill's deposition statements concerned a matter within the scope of his agency as Saks' partner. They did. Spruill testified about the circumstances surrounding the $19 million Corpus Christi loan--a financial obligation which he and Saks had incurred as partners of Omni/Corpus Christi Ltd.. This matter arose from the business of Spruill and Saks' partnership and was therefore within the scope of their agency relationship. The

fact that Spruill was noticed for deposition as an individual does not mean that his statements were not about a partnership matter.

Finally, we must determine whether Spruill made his statements during the existence of the agency relationship. If he did not, the statements were inadmissible regardless of their substance. Blanchard v. Peoples Bank, 844 F.2d 264, 267 n.7 (5th Cir. 1988); United States v. Summers, 598 F.2d 450, 458 (5th Cir. 1979). As Saks has observed, Omni/Corpus Christi Ltd. petitioned for bankruptcy a few months before Spruill testified at the first deposition, an act which dissolved the partnership under Texas law. Texas Uniform Partnership Act § 31(5). Saks argues that this precludes a finding of an agency relationship that could support the admission of Spruill's statements against him.

The partnership does not terminate on dissolution, however. It continues during the wind up of partnership affairs. Texas Uniform Partnership Act § 30; Woodruff v. Bryant, 558 S.W.2d 535, 539 (Tex. Civ. App. -- Corpus Christi, 1977) ("Generally when the partnership is dissolved, the partnership continues during the period of winding up until all preexisting matters are terminated. . . . It is only upon termination that the final partnership relationship ceases to exist."); Bader v. Cox, 701 S.W.2d 677, 682 (Tex. App. 5 Dist. 1985). Texas partnership law dictates moreover that "[a]fter dissolution a partner can bind the partnership . . . [b]y any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution." TUPA § 35(a).

23

"Winding up" is not defined in the Act, but generally refers to the process of completing unfinished transactions and settling partnership affairs after dissolution. Cates v. International Telephone & Telegraph, 756 F.2d 1161, 1174 n.22 (5th Cir. 1985); Childers v. United States, 442 F.2d 1299, 1303 (5th Cir. 1971). A leading partnership treatise says that "litigation of claims by and against partners is a part of winding up." Crane & Bromberg, Partnership 460 (1968). We conclude that under Texas law, the admissions of a partner made in the course of litigation over pre-dissolution claims, incident to winding up the partnership affairs, are admissible in evidence against co-partners. Compare Filesi, 352 F.2d at 342-43 ("[A] partner has the authority to bind the other members of the firm by statements made after dissolution of the partnership only when the statements are made while in the process of winding up the partnership affairs.").

Spruill was in the process of settling partnership affairs when he testified in the deposition about the Corpus Christi loan. The partnership had been dissolved by the bankruptcy, but a large debt remained in dispute. Litigation over repayment of this debt was part of winding up and closing out a partnership transaction. Spruill made statements in an effort to forestall repayment of the loan and reap damages because it was usurious. These statements were made as agent for Saks and were binding on him. They were therefore admissible against Saks under Rule 801(d)(2)(D).

Saks also argues that the admission of Spruill's deposition statements violated his rights under the Confrontation Clause of

24

the Sixth Amendment.  He relies on <u>Bruton</u>, <u>supra</u>, where the Court established a rule barring the admission in a joint trial of the incriminating pre-trial statements of a non-testifying co-defendant.  <u>See also</u> <u>Cruz v. New York</u>, 481 U.S. 186 (1987); <u>United States v. Schmick</u>, 904 F.2d 936 (5th Cir. 1990).  <u>Bruton</u> has been limited, however, to cases where the admission of the incriminating statements was not within a firmly rooted exception to the hearsay rule.  In <u>Bourjaily v. United States</u>, 107 S. Ct. 2775 (1987), a district court admitted the incriminating, out-of-court statements of a non-testifying co-conspirator against the defendant, reasoning that the statements fell within the hearsay exception for co-conspirators under Rule 801(d)(2)(E).  The Court upheld the defendant's conviction against a Sixth Amendment challenge, reasoning that "no independent inquiry into reliability is required when the evidence 'falls within a firmly rooted hearsay exception'" like that for co-conspirators.  107 S. Ct. at 2782-83 (quoting <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).  Thus both of the independent inquiries generally required to satisfy the Sixth Amendment--that the declarant be unavailable and that the statements bear sufficient indicia of reliability--could be dispatched in cases where the statements met the requirements of Rule 801(d)(2)(E).  <u>Id.</u>; <u>see also</u> <u>United States v. Inadi</u>, 475 U.S. 387 (1986).  The Court has since applied the same reasoning to the "spontaneous declaration" and "medical examination" exceptions to the hearsay rule.  <u>White v. Illinois</u>, 112 S. Ct. 736 (1992).

25

We see no reason to distinguish between Rule 801(d)(2)(D) and these other hearsay exceptions. The agency exception is equally rooted in our jurisprudence. See Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 250 (1917) ("[T]he declarations and conduct of an agent, within the scope and in the course of his agency, are admissible as original evidence against the principal, just as his own declarations or conduct would be admissible."); Vicksburg & Meridian Railroad v. O'Brien, 119 U.S. 99, 104 (1886) (agent's statements admissible against principal if made contemporaneously with acts that bind the principal).[8] Indeed, agency theory underlies the co-conspirator exception. See Anderson, supra; Bourjaily, 107 S. Ct. at 2785 (Brennan, J., dissenting). The two exceptions are hand in hand. We conclude that if statements meet the requirements of Rule 801(d)(2)(D), as they do here, the Confrontation Clause is satisfied.

V.

Spruill and Saks also argue that their conviction on several counts of bank fraud arising from a single scheme was multiplicitous. They rely on United States v. Lemons, 941 F.2d 309, 316-18 (5th Cir. 1991), where we found multiplicity in defendant's bank fraud convictions because § 1344 imposes

---

[8] Vicksburg's limitation on the admissibility of an agent's declarations against the principal is not violated here. Spruill was testifying about past events, but he did so in the course of fulfilling his duties as partner to wind up the partnership's extant transactions. Thus he is different from the engineer in Vicksburg, whose authority did not include the power to make statements about prior trips and whose statements were not explanatory of anything in which he was then engaged. 119 U.S. at 105.

26

punishment only for execution of the scheme, not each act in its furtherance. The government has conceded that defendants' convictions were multiplicitous under Lemons, and we agree. Defendants were impermissibly convicted on several counts for committing several acts in furtherance of a single scheme to defraud.

Defendants argue further that Lemons requires us to reverse and dismiss all of their bank fraud convictions because the indictment does not allege an offense under § 1344. Because each individual act does not constitute a scheme for the purposes of this statute, the argument goes, each count that referred to a specific act failed to charge an offense. This argument is without merit. Defendants did not object to the indictment below. We therefore read the indictment liberally to be sufficient "'unless it is so defective that by any reasonable construction, it fails to charge an offense.'" United States v. Salinas, 956 F.2d 80, 82 (5th Cir. 1992) (citation omitted). Each count of the indictment alleged that Saks and Spruill knowingly executed a scheme to defraud the banks by performing an individual act in execution of the scheme. The individual acts were described in each count. This was multiplicitous, but it was sufficient to charge an offense under § 1344.

We have explained that "multiplicity addresses double jeopardy; and where the jury is allowed to return convictions on multiplicitous counts, the remedy is to remand for resentencing, with the government dismissing the counts that create the

27

multiplicity." United States v. Moody, 923 F.2d 341, 347-48 (5th Cir. 1991). We accordingly remand the case and direct the government to elect the § 1344 count that it wishes to leave in effect. The court must then vacate the convictions on the remaining § 1344 counts and resentence the defendants.

AFFIRMED in part, VACATED and REMANDED in part.

E.Grady Jolly, dissenting:

I respectfully dissent. Although I agree that the evidence will support a conviction under section 1344,[9] it does not support this conviction under section 1344(1), which makes it unlawful to defraud a financial institution. Instead, the evidence supports a violation of section 1344(2), which makes it unlawful to obtain monies from a financial institution by means of false pretenses or representations.

The bank was defrauded of no monies, see McNally v. United States, 483 U.S. 350, 358-359 (1987), notwithstanding the strained efforts of the majority to say that is was. Of course, the officers and owners of the bank were fully aware of the actual

---

[9]18 U.S.C. § 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice --
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

1

terms and conditions of the loan. Second, the loan the defendants actually received, as far as the purposes of this opinion are concerned, was backed by adequate collateral. Third, the bank as an institution was relieved of regulatory problems by the infusion of $5,000,000. Finally, the transaction effectively resulted in the bank obtaining additional guarantors on a delinquent loan. In short, it is only in hindsight, with the knowledge that the Saks and Spruill loan "went bad" later, that we can say that the bank suffered a loss in the transaction. The evidence presented is simply insufficient to support a conviction under section 1344(1);[10] or stated another way, section 1344(1) does not reach the conduct described by the majority.[11]

_____

[10]The majority cites United States v. Castiglia, 894 F.2d 533, 536-38 (2d Cir. 1990); United States v. Walker, 871 F.2d 1298, 1306-07 (6th Cir. 1989); and United States v. Shively, 715 F.2d 260 (7th Cir. 1983), to support the proposition that a **borrower** may defraud a bank under section 1344(1) by omitting from a loan application the fact that a beneficiary of the loan is a bank officer. Slip op., p. 9. These cases, however, are inapposite. In none of these cases was a borrower charged with bank fraud under section 1344(1), as opposed to misapplication of funds or making false statements. See Castiglia, 894 F.2d at 535 (borrowers charged with conspiracy, 18 U.S.C. § 371; with aiding and abetting a misapplication of funds, 18 U.S.C. §§ 2 and 656; with making false entries, 18 U.S.C. § 1005; and with perjury, 18 § 1623); Walker, 894 F.2d at 536 (sole defendant is bank officer; pinpoint cite is to discussion of officer's liability under 18 U.S.C. § 656 in United States v. Krepps, 605 F.2d 101 (3rd Cir. 1979)(in which a bank officer was the sole defendant)); Shively 715 F.2d at 264 (borrower indicted under 18 U.S.C. §§ 656 and 1014 but convicted only under § 656).

[11]Whatever happened to the rule that penal statutes are to be strictly construed?

Saks and Spruill, however, clearly obtained money by falsely representing in their application the recipients of the loan and the use of the funds.  Their application represented that Saks and Spruill would receive a loan of $19.3 million, and that the funds would be used for the development of the shopping mall on the Corpus Christi tract, when the defendants actually received only $14.3 million, with $5 million going through Stockman to pay off the Chaucer Village loan at Security.

Indeed, receipt of money from the banks under false pretenses is exactly the crime for which they were indicted.[12]  Unfortunately, however, the jury was only instructed under section 1344(1).  Thus,

[12]The indictment charges, for example:
                    COUNT TWO - BANK FRAUD
                    [18 U.S.C. §§ 1344, 2 ]
     ..... Defendants ... SAKS and SPRUILL knowingly executed and attempted to execute, a scheme and artifice to defraud Meridian, Security, and Peoples and to obtain moneys, funds, and other property owned by or under the custody or control of Meridian, Security, and Peoples by means of false and fraudulent pretenses, representations, and promises by performing the following act in execution of the scheme:
     3.  Defendants ... SAKS and SPRUILL signed and caused to be signed a Loan Agreement which falsely represented that the purpose of the $19.3 million loan was for business related to Omni and omitted any reference to Ray Stockman, when in truth and in fact, as the defendants well knew, $5 million of the $19.3 million in loan proceeds would be channelled through Ray Stockman back to Security for payment on the Chaucer Village loan, a loan totally unrelated to the loan for which the $19.3 million was intended.
All in violation of Title 18, United States Code, Sections 1344 and 2.

Each count repeated this language in its description of the crime.

although the text of the indictment charged the defendants with violating section 1344(2), and although the evidence sufficiently establishes this crime, the jury was given no instruction to convict them of this crime.  Because I do not think the evidence is sufficient for them to be convicted of 1344(1), and because the court failed to instruct the jury on 1344(2), I would apply the plain error standard and remand for a new trial.