UNITED STATES of America, Appellee/Cross–Appellant,

v.

Conrad Bruce SOLOMONSON a/k/a C. Bruce Solomonson, Appellant/Cross–Appellee.

Nos. 89–5124, 89–5140.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1990.

Decided July 13, 1990.

Corey J. Ayling, Minneapolis, Minn., for appellant/cross-appellee.

Henry J. Shea, Minneapolis, Minn., for appellee/cross-appellant.

Before LAY, Chief Judge, BEAM, Circuit Judge, and HANSON,* Senior District Judge.

BEAM, Circuit Judge.

Conrad Bruce Solomonson was convicted of eight counts of mail fraud and one count of bank fraud. *See* 18 U.S.C. §§ 1341, 1344

(1988). On appeal, he asserts several evidentiary errors as grounds for reversal. Further, he argues that the district court[1] incorrectly instructed the jury that financial loss to a bank is not an element of bank fraud. The government cross-appeals the district court's refusal to impose a special assessment required by 18 U.S.C. § 3013 (1988).

## I. BACKGROUND

Solomonson was in the insurance business in the Minneapolis area for more than twenty-five years. After 1977, when he formed his first insurance agency, Professional Writers, Inc. (PWI), he organized several insurance-related companies using substantial personal investments and outside financing from, among others, National City Bank (NCB) in Minneapolis. Trial Transcript vol. X, at 1758–61. PWI also was financed, at least in part, with a loan from NCB. *Id.* at 1760–61.

PWI suffered through some rough financial times and at one point was near bankruptcy. *Id.* vol. VI, at 983. Eventually, PWI was unable to make the payments on the note held by NCB. *Id.* vol. I, at 94–95. In 1983, Solomonson, Pat McGovern, who was an employee of PWI, and another entity formed Regional Financial Agency (RFA) to purchase the assets of PWI. *Id.* vol. X, at 1766. Solomonson personally invested substantial amounts of money in RFA. Additionally, RFA borrowed $1.5 million from NCB. *Id.* at 1767. The NCB loan was renewable yearly, provided that RFA submitted certain financial information. Part of the proceeds of this loan was paid to NCB in satisfaction of PWI's debts.

As collateral for the note, RFA put $600,-000 of the loan proceeds into a certificate of deposit at NCB, and Solomonson, to secure his personal guaranty, gave NCB a second mortgage on his home. *Id.* vol. II, at 114–16. As further security, RFA was required to provide NCB with monthly financial statements and annual audited fi-

* The Honorable William C. Hanson, Senior United States District Judge for the Northern/Southern Districts of Iowa, sitting by designation.

[1] The Honorable Edward J. Devitt, Senior United States District Judge for the District of Minnesota.

nancial statements and letters certifying that RFA was in compliance with all terms and covenants of the loan agreement. *Id.* at 115. NCB also required that Solomonson provide personal financial statements. *Id.* vol. I, at 97–99.

In 1985, the owners of RFA purchased the Caswell–Ross Agency, an established insurance agency. *Id.* vol. VI, at 1023–27. Caswell–Ross and RFA shared office space and some personnel but were operated as separate entities. Solomonson served as chairman of the board of directors of both Caswell–Ross and RFA. McGovern served as president and chief operating officer of both agencies.

Although PWI, and later RFA and Caswell–Ross, had "some of the best accounts in the Twin Cities," the agencies were short of cash and did not remit premiums to the insurance companies in a timely fashion. *Id.* at 986, 1029. Indeed, RFA was formed to provide an influx of capital when it became apparent that PWI did not have sufficient cash flow to remit the premiums due the insurance companies. *Id.* at 990–96. Even after the reorganization, however, the cash flow problems continued. Solomonson told McGovern not to worry about how he handled the payments to the carriers. This, among other things, led to conflict between Solomonson, McGovern and Toby Morrison, who had joined the agencies in November of 1986 to represent the interests of the third owner. Eventually, McGovern and Morrison decided that they could not maintain a working relationship with Solomonson because of the financial problems and because of the way he treated employees. *Id.* at 1045–67.

In the spring of 1987, McGovern and Morrison presented Solomonson with a proposal for a separation and requested an audit of both RFA and Caswell–Ross. *Id.* at 1066–67. At this time, Solomonson denied misusing any corporate funds. Against Solomonson's protest, an audit was conducted. The auditor discovered, among other problems, that in excess of $1.3 million had been transferred from Caswell–Ross to RFA. These transfers did not appear in the intercompany account on the

financial statements. *Id.* vol. IX, at 1475–78. As the audit progressed, it became apparent that Solomonson had diverted over $1 million from the agencies to his personal use. *Id.* vol. VI, at 1069–72. Additionally, the audit revealed that payroll tax returns had not been filed from June of 1986 forward, a liability in excess of $500,-000 which did not appear on the financial statements. *Id.* vol. IX, at 1479–81. In August of 1987, the board of directors severed the relationship between the agencies and Solomonson. *Id.* vol. VI, at 1074. The mail and bank fraud charges followed.

At trial, Denise Baumann, Solomonson's personal secretary, testified that Solomonson had directed her to transfer funds from PWI and RFA accounts to his personal accounts. *Id.* vol. II, at 244–47. She testified that Solomonson directed her to make changes in the companies' financial statements. *Id.* at 258–62. In general, these adjustments were made to decrease the accounts payable which reflected the amounts owed to the insurance carriers for premiums on policies sold and to hide the transfer of funds from Caswell–Ross to RFA and, ultimately, to Solomonson. Baumann also testified that as the cash flow at RFA became strained, payroll withholding taxes were collected from the employees but not paid to the federal and state authorities. *Id.* vol. III, at 343.

## II. DISCUSSION

Solomonson argues that the district court committed reversible error in: 1) allowing the government to present irrelevant and prejudicial testimony regarding his personal expenditures; 2) not striking references to nonpayment of employee payroll withholding taxes from the indictment and allowing evidence of such nonpayment, including a prior incident, during the trial; and 3) allowing the F.B.I. case agent to testify as to the honesty of two of the government's witnesses. He also contends that the court erroneously instructed the jury regarding the elements of bank fraud.

### A. *Evidentiary issues*

We begin our review with the evidentiary issues. Initially, we review the sufficiency

of Solomonson's objections to the personal expenditure evidence and the testimony of the F.B.I. agent.

### 1. Personal expenditure evidence.

During the government's case-in-chief, the prosecutor introduced several exhibits which detailed Solomonson's personal expenditures between January of 1984 and May of 1987. The F.B.I. case agent assigned to this investigation, Anthony D'Angelo, testified regarding the preparation of the exhibits and explained what each one represented. The evidence indicated that Solomonson spent substantial amounts of money on art, jewelry, private schools, housing and cars. He also wrote checks for large amounts to members of his immediate family. *Id.* vol. X, at 1705–20..

Solomonson had filed a motion in limine to exclude any evidence relating to his personal expenditures. The district court did not rule on the motion in limine before trial. When each exhibit was offered, the court stated: "Absent objection, it may be received." *See, e.g., Id.* vol. I, at 81. However, Solomonson did not make contemporaneous objections at the time the exhibits were offered or at the time D'Angelo testified. Thus, we will review only for plain error. *See* Fed.R.Crim.P. 52(b).

As this court recently noted, relief will be granted under the plain error doctrine only if the error "prejudices the substantial rights of the defendant and would result in a miscarriage of justice if left uncorrected." *United States v. Carey,* 898 F.2d 642, 644 (8th Cir.1990). We review for plain error considering the record as a whole and reverse only to protect the fundamental fairness of the proceeding. *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

■ We fail to see how Solomonson's substantial rights were violated by the admission of this evidence. This court, among others, has held that such evidence is admissible to prove that a diversion of funds was fraudulent. *United States v. Brickey,* 426 F.2d 680, 685–86 (8th Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *see United States v.*

*Hathaway,* 798 F.2d 902, 908–09 (6th Cir. 1986); *United States v. Brutzman,* 731 F.2d 1449, 1452–53 (9th Cir.1984); *United States v. Knight,* 607 F.2d 1172, 1176 (5th Cir.1979); *United States v. Krohn,* 573 F.2d 1382, 1388–89 (10th Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). Here, Solomonson argues that because he did not deny receiving the funds, and believed that he was entitled to receive them, how he spent the funds was irrelevant. However, the government was entitled to prove that diversions occurred, and the personal expenditure evidence may have been probative of both the fact that a diversion occurred and that such diversion was fraudulent. Thus, we hold that the admission of the evidence, in light of the record as a whole, did not constitute plain error. We note that even if the district court erred in admitting the personal expenditure evidence, the other evidence against Solomonson was so substantial that any error was harmless.

### 2. Credibility testimony

■ Next, Solomonson contends that Agent D'Angelo improperly testified, on redirect examination, as to the honesty of Baumann and McGovern. As the last witness in its case-in-chief, the government recalled Agent D'Angelo. In general, the prosecutor attempted to rehabilitate Baumann and McGovern after Solomonson, on cross-examination, had attacked their credibility. D'Angelo testified that neither of the witnesses were promised anything in exchange for their testimony. Then, the testimony to which Solomonson objects ensued:

Q  And during the times that you talked to her [Baumann] throughout the investigation, did she ever provide you any information that you later learned to be false or incorrect?

A  Not thus far.

. . . .

Q  And has he [McGovern] ever provided you any information that you later learned to be false or incorrect?

A No, he hasn't.

Transcript vol. X, at 1701, 1704.

This testimony also was received without a contemporaneous objection. After the government concluded its redirect, Solomonson moved to strike D'Angelo's testimony "to the extent that he has testified to the honesty of the witnesses Baumann and McGovern on the basis that a witness here such as an FBI agent can't testify to their honesty or credibility. That is exclusively for the members of the Jury to determine." *Id.* at 1720.

To preserve error for appellate review, a timely objection must be made. Fed.R. Evid. 103(a)(1); *Terrell v. Poland,* 744 F.2d 637, 638–39 (8th Cir.1984). "[F]or an objection to be timely it must be made at the earliest possible opportunity after the ground of objection becomes apparent, or it will be considered waived." *Terrell,* 744 F.2d at 638–39 (citing *Isaacs v. United States,* 301 F.2d 706, 734 (8th Cir.), *cert. denied,* 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962)). In *Terrell,* we held that a motion to strike a hearsay statement at the close of all the evidence was not timely when the grounds for the objection were apparent at the time the evidence was offered and received. *Id.* A motion to strike, however, is sufficient to preserve error for review when the evidence appears admissible when offered and only upon subsequent developments does it appear objectionable. *Isaacs,* 301 F.2d at 734 (quoting *Marx v. United States,* 86 F.2d 245, 251 (8th Cir.1936)).

Thus, we doubt that the motion to strike was sufficient to preserve the alleged error for review. Additionally, we question, although it is a close call, whether the motion to strike, even if timely, was sufficient to apprise the district court of the alleged error. When he moved to strike, Solomonson merely stated that an FBI agent cannot testify as to the honesty or credibility of a witness.

On appeal, Solomonson correctly asserts that expert opinion as to the truthfulness of a witness is not proper, *see United States v. Roy,* 843 F.2d 305, 307–09 (8th Cir.), *cert. denied,* 487 U.S. 1222, 108 S.Ct.

2881, 101 L.Ed.2d 916 (1988); *United States v. Azure,* 801 F.2d 336, 339–41 (8th Cir.1986), and that specific instances of conduct are not admissible to rehabilitate a witness whose credibility has been challenged. *See* Fed.R.Evid. 608(b). However, to rehabilitate a witness whose credibility has been attacked, any competent witness can testify, in the form of opinion or reputation, as to a witness's truthful character. Fed.R.Evid. 608(a).

Here, the proper objection was to the form of, or the lack of foundation for, the questions. Had Solomonson objected on these grounds, the district court could have required the government to lay further foundation. Had the government been unable to lay the foundation, the district court should have excluded the testimony. Absent proper objection, however, plain error is the appropriate standard of review. As indicated, we review for plain error in light of the entire record. The district court's refusal to strike the testimony did not adversely affect Solomonson's substantial rights and, based on the record as a whole, we conclude that no miscarriage of justice occurred.

3. Nonpayment of withholding taxes

■ The indictment alleged that Solomonson, aided and abetted by Baumann, failed to remit in excess of $500,000 in federal and state employee payroll withholding taxes and, instead, used those funds to conceal the diversion of funds from RFA and Caswell–Ross to his personal accounts. Solomonson claims that the failure to remit the taxes was merely a breach of fiduciary duty and was not, in and of itself, fraudulent. He argues that the nonpayment was not part of the scheme to defraud and should have been stricken from the indictment, and that the court erred in overruling his objection to Baumann's testimony on this matter.

Solomonson relies on *United States v. Pintar,* 630 F.2d 1270 (8th Cir.1980), to support his argument that a mere breach of fiduciary duty, without a misrepresentation and concealment, does not constitute a scheme to defraud. He asserts that the

nonpayment of taxes, without allegations that he misrepresented that they were paid or that he attempted to conceal the nonpayment, was beyond the limits of a scheme to defraud as set forth in *Pintar.*

In *Pintar,* the scheme to defraud involved requests for funds for secretarial positions, which the defendants knew were unnecessary, at an agency supported by federal funding. This court noted that allegations of improper travel, political work of the defendants, and misuse of a state agency's employees were not related to the scheme to obtain funds for the secretarial positions. *Id.* at 1279 n. 10. Absent a connection between the alleged activities and the scheme to obtain funding for unnecessary secretarial positions, the allegations were not part of the scheme to defraud.

Here, we agree with the government that the failure to remit the withholding taxes, while not a separate, deceitful scheme, was part of the larger fraudulent stratagem. We recognize that actions that have the effect of delaying a complaint, making apprehension less likely, or giving a false sense of security to the victim can be considered part of a scheme to defraud. *United States v. Taylor,* 789 F.2d 618, 620 (8th Cir.1986). As the diversion of funds grew, it became more difficult for RFA and Caswell–Ross to pay premiums due the insurance carriers. Solomonson needed additional funds to meet the agencies' obligations. Thus, he used the tax funds to bolster the cash flow, meet payment obligations and delay the discovery of the criminal plan. We find no error in admitting this evidence.

### 4. Prior acts

■ The government also introduced evidence, through the testimony of Carol Eater, a former employee of PWI, that Solomonson had delayed payment of withholding taxes at PWI in 1981 when cash flow was tight. Solomonson argues that the

district court erred in allowing this testimony because it was not probative of any issue beyond his propensity not to pay taxes. He asserts that under the standard announced in *United States v. Mothershed,* 859 F.2d 585 (8th Cir.1988), the evidence was inadmissible because the government merely listed the requirements of Federal Rule of Evidence 404(b) [2] without specifying what the evidence established beyond bad character. We disagree.

In *Mothershed,* we noted that other acts evidence is admissible " 'unless it tends to prove only the defendant's criminal disposition.' " *Mothershed,* 859 F.2d at 589 (quoting *United States v. O'Connell,* 841 F.2d 1408, 1422 (8th Cir.), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988)). Further, we held that while a mere list of possible purposes for the evidence was not desirable, it was not grounds for reversal. *Id.* Here, Baumann made inconsistent statements regarding Solomonson's knowledge of the nonpayment of taxes during the period alleged in the indictment. The prior nonpayment clearly was relevant to show Solomonson's knowledge of the payment requirement, a common plan, and lack of mistake or accident relating to the nonpayment of taxes during the time alleged in the indictment. The court properly received this testimony and instructed the jury on its limited use.

### B. *Bank fraud*

■ Solomonson contends that he cannot be convicted of bank fraud because the note held by NCB was over-secured and NCB will not suffer any financial loss as a result of the fraud. He argues that the bank must be a victim of the fraud, and, without suffering a financial loss, NCB cannot be a victim. Further, he asserts that the district court erroneously instructed the jury that it could convict him without finding that the bank suffered a finan-

---

**2.** Fed.R.Evid. 404(b) provides in relevant part: "Evidence of other ... acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, how-

ever, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

cial loss.[3]

Whether a bank must suffer a financial loss to support a conviction for bank fraud under section 1344[4] is a question of first impression in the Eighth Circuit. The courts of appeals that have addressed this issue, however, have concluded that financial loss by a bank is not required. *See United States v. Mason,* 902 F.2d 1434 (9th Cir.1990); *United States v. Church,* 888 F.2d 20, 24 (5th Cir.1989); *United States v. Walker,* 871 F.2d 1298, 1305 n. 6 (6th Cir. 1989); *United States v. Bonallo,* 858 F.2d 1427, 1433 n. 7 (9th Cir.1988); *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987). We agree with this interpretation.

Section 1344 makes it a crime to execute, *or attempt to execute,* a scheme to defraud a federally insured bank. On its face, the statute does not require that a bank suffer financial loss. Additionally, the legislative history does not indicate that such loss is required. Section 1344 was modeled after the mail and wire fraud statutes. S.Rep. No. 225, 98th Cong., 2d Sess. 378–79 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3519. As noted in *Mason,* the legislative history indicates that section 1344 is to have the same broad scope as the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343 (1988), and that the case law interpreting these statutes should be used to interpret section 1344. This court recently agreed that section 1344 should be construed broadly. *United States v. Matousek,* 894 F.2d 1012, 1014 (8th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1832, 108

L.Ed.2d 961 (1990). Thus, section 1344 must be given a broad reading that is in accordance with sections 1341 and 1343.

This court has held that evidence that someone was actually defrauded is not required for a conviction under section 1341. *United States v. Gaskill,* 491 F.2d 981, 984–85 n. 5 (8th Cir.1974). A scheme to defraud does not have to be successful to support a conviction for mail fraud. *United States v. Gross,* 416 F.2d 1205, 1209–10 (8th Cir.1969). As noted by the Second Circuit in a mail fraud case,

[c]ritical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent. However, the government is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants. No actual pecuniary injury, therefore, need result to the victim of the fraud.

*United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (citations omitted).

Solomonson contends that *United States v. Blackmon,* 839 F.2d 900 (2d Cir.1988), which held that section 1344 is applicable only when the scheme to defraud is directed at a bank, requires that the bank suffer a loss in order to support a conviction. Solomonson asserts that *Blackmon* requires that the bank be a victim of the fraud, and, to be a victim, the bank must suffer a loss. *Blackmon,* however, actually requires only that the scheme to defraud be directed at the bank rather than some other person or entity. Our holding is not contrary to *Blackmon.*

---

**3.** The court gave the following instruction regarding the elements of bank fraud:

The law makes it a Federal crime for anyone to execute or attempt to execute a scheme to defraud a federally-insured bank.

In order to find Defendant guilty of this offense the Government must prove beyond a reasonable doubt:

One: The Defendant knowingly and willfully executed a scheme to defraud a bank.

Number 2: That bank was federally insured. That has been stipulated to.

It is not necessary for the Government to show that the bank has suffered a financial loss or that Defendant profited from the acts alleged in the indictment in order to establish an intent to defraud.

Trial Transcript vol. XIV, at 2240.

**4.** 18 U.S.C. § 1344 provides:

(a)—Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a federally chartered or insured financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

We have difficulty believing that, while Congress made it a crime to *attempt* to defraud a bank, a successful scheme to defraud that does not result in financial loss to a bank is not within the conduct proscribed by section 1344. Thus, we hold that the government was not required to prove that NCB suffered a financial loss. The district court's instructions properly stated the law.

## III. CONCLUSION

We have closely reviewed Solomonson's other claims and find them to be without merit. However, we reverse the district court's refusal to impose the statutory special assessment. *See United States v. Munoz–Flores,* —— U.S. ——, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). We remand this aspect of the case to the district court with directions to impose the assessment required by law. In all other respects, the judgment of the district court is affirmed.