Timothy RUSH, Appellant,

v.

James SMITH; Silas Hardison; David Robbins; James Conway; Rita Krapf; Nesby Moore; Vincent Schoemehl, Appellees.

No. 93–3585.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1994.

Decided Jan. 23, 1995.

Rehearing and Rehearing En Banc Granted; Opinion and Judgment Vacated March 16, 1995.

Kenneth E. Dick, St. Louis, MO, argued (Donald S. Singer, on the brief), for appellant.

Jim Wilson, St. Louis, MO, argued, for appellee.

Before McMILLIAN and MAGILL, Circuit Judges, and BOGUE,* Senior District Judge.

MAGILL, Circuit Judge.

Timothy Rush appeals the trial court's denial of his motions for a new trial and for default judgment in this civil rights action under 42 U.S.C. § 1983. Rush argues that the trial court erred by dismissing the sole black juror, by making prejudicial comments to the jury, by denying his motions for a new trial and default judgment based on defendants' abuse of discovery, and by denying his motion for a new trial on grounds that the verdict was against the weight of the evidence. We affirm.

## I. BACKGROUND

After an eight-day trial, running from February 22 through March 3, 1993,[1] a jury returned a verdict for defendants, St. Louis police officers and the St. Louis Board of Police Commissioners, in this excessive force claim. Timothy Rush appeals the trial court's denial of his motion for a new trial, arguing that the trial was prejudiced by the dismissal of the sole black juror and by the court's comments regarding that dismissal; that discovery abuses by defendants warranted a default judgment or new trial; and that the jury verdict was manifestly unjust and against the weight of the evidence.

* The Honorable Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

## A. Juror Dismissal

On the fourth day of trial, February 25, there was a snowstorm in St. Louis resulting in ten to fourteen inches of snow on the ground by morning. Dorothy Bleuett, the only black juror, advised the trial court's staff that she would not appear that day due to the snow. Before the judge's arrival, plaintiff's counsel requested that a marshal pick Bleuett up in his car. The marshal agreed, but the judge indicated by telephone that the marshal was not to leave court, as only a "skeleton staff" was present that day. IV Trial Tr. at 7. When the judge arrived at court, he stated to counsel that the jurors present were the jurors who would sit, and that it was already late and "ample time to start this case." IV Trial Tr. at 7–8. Plaintiff's counsel requested permission to send a taxicab for Bleuett, but the judge denied the request on the grounds that party involvement in juror transportation was problematic, and that there was no guarantee that Bleuett would be willing to come to court even if a taxi were provided.

When the jury entered, the court explained Bleuett's absence to them:

I've got to preserve the justice and pursuit of justice by this Court, prevailed upon the City to put at least one of those black ladies on this panel so that Mr. Rush would be at least represented ethnic-wise or race-wise. I just, I'm not a damn fool. I haven't been around here for seventy-six years and not found out that the races have a tendency to stick together and that may be good or bad, but whatever it is, it exists.

IV Trial Tr. at 19. After the judge completed his remarks to the jury, counsel approached the bench:

MR. DICK [Counsel for plaintiff]: ... I know the Court's intention is good, but I would just, I think what was said might give the impression that the City was the one who graciously put a black juror on.

1. All dates refer to 1993 unless otherwise indicated.

THE COURT: I put the black juror on. I said, "I did it." I asked the attorneys to do it. I didn't say which one.

. . . .

MR. SINGER [Counsel for plaintiff]: I thought the City gracious,—I thought you used the term that the City graciously agreed and maybe I'm mistaken, Judge, but,—

THE COURT: Well, I'll clear it up if I did.

MR. SINGER: Well, now Judge, I think that'll only emphasize what was done.

THE COURT: Well, what do you want me to do?

MR. SINGER: Well, I mean, I'd like to go on and try this case. If your Honor thinks he can correct the measure without any further emphasis,—

THE COURT: Okay, let's go.

MR. SINGER: —then I would agree to do it, but,—Okay. The first witness, we had asked the City to produce Mr. Scott.

IV Trial Tr. at 20–21.

## B. Discovery

Before trial, plaintiff Rush presented defendants with a request for production of documents concerning prior firearms training provided to St. Louis police officers, including defendant Smith. Defendants responded that they had no documents concerning the annual firearms qualification program as it was when Smith graduated from the police academy or concerning changes in the program since that time; that Smith had not attended any in-service firearms courses other than annual qualifications since graduating from the academy because such courses did not exist; and that they objected to requests for all proposals or requests presented to the Board of Police Commissioners concerning the provision of firearms training to St. Louis police officers and for all complaints where it was alleged that a St. Louis police officer had misused firearms or wrongfully shot at an individual. Among documents produced by defendants was a Police Department Special Order providing for administrative investigation and report (ARTS report) regarding every incident in which an officer discharges a firearm, an annual shots fired report, and establishing a firearms review committee.

Plaintiff then presented defendants with a second request for production of documents, requesting production of the ARTS report on the incident at issue in the case, all ARTS reports prepared pursuant to the Special Order, all annual shots fired reports, and all firearms review committee reports and recommendations. Defendants objected to the requests for the ARTS reports and for the shots fired reports as burdensome.

Plaintiff filed a motion to compel discovery of the documents not produced by defendants, and on February 11, there was a hearing on this motion. At the conclusion of the hearing, the court ordered defendants to produce any documents showing purchases of firearms training equipment, any documents regarding firearms training proposals rejected during the previous seven years, and any information regarding the use or misuse of firearms by police officers. In addition, the court ordered the Board of Police Commissioners to designate competent witnesses for deposition on this subject. Defendants produced documents regarding the purchase of a firearms simulator, but no documents concerning a 1992 firearms study, no ARTS reports, and no other documents concerning the use of firearms. The Board provided a list of potential witnesses for deposition.

On the first day of trial, February 22, plaintiff argued a motion for default judgment based on allegations that defendants failed to comply with discovery orders; the motion was denied. On the third day of trial, February 24, defendants provided plaintiff with documents constituting the underlying materials for a study concerning police use of firearms conducted by the police department in 1992. That evening, plaintiff deposed the police department employee who delivered the documents. On February 25, plaintiff again raised a motion for default judgment; again, it was denied.

## C. Weight of the Evidence

The facts of the incident from which this case arose were presented to the jury in the form of directly conflicting testimony by plaintiff's and defendants' witnesses. It is

clear that plaintiff Rush was shot by St. Louis police officer Smith at approximately 12:30 a.m. on January 1, 1990, in or near his house. The circumstances surrounding the shooting, however, were presented differently to the jury by plaintiff and by defendants.

Plaintiff's witnesses testified that plaintiff Rush was in his house on the second floor, wearing only pajama bottoms, while Michael Mayhorn, a guest at the house, was in the backyard firing a shotgun in celebration of the new year. Rush's grandmother asked that Rush stop Mayhorn from firing further shots. Rush descended to the kitchen to do so and, while in the kitchen looking out through the screen door, was shot by Smith.

Defendants' witnesses testified that, responding to a call reporting shots in the area, officers Smith and Hardison approached the rear yard of the house and saw two figures in the yard, one of whom was firing a shotgun at them. After twelve to fourteen shots, Smith returned fire, firing a total of five shots. During this exchange, the figure with the gun, who was wearing blue pants and a dark shirt, passed it to the second figure, and entered the house. Two neighbors testified that they saw two figures in the yard. One neighbor, Pamela Rudderforth, testified that she saw one of the figures firing at two police officers who were behind a tree, and that one of the figures then slumped over and climbed up the back stairs into the house. Plaintiff's witness testified that Rudderforth could not have seen the back of the house from her window; defendants' witness testified that she could.

## II. DISCUSSION

### A. Juror Dismissal

Rush first argues that the trial court erred by denying his motion for a new trial on the grounds that the court's dismissal of the sole black juror and the court's comments to the

jury regarding that dismissal prejudiced his trial.

 We review the trial court's decision to dismiss Dorothy Bleuett from the jury for abuse of discretion. *United States v. Key,* 717 F.2d 1206, 1209 (8th Cir.1983). "The decision of whether or not to remove a juror is normally vested in the wise discretion of the trial court. If the record shows a legitimate basis for his decision, there is no abuse of that discretion." *Id.* (citing *United States v. Peters,* 617 F.2d 503 (7th Cir.1980)). The trial court's findings show a legitimate basis for Bleuett's dismissal. Bleuett informed the court that she would not attend court that day because she would not travel when there was almost a foot of snow on the ground. The court would not authorize a marshal to "chauffeur" Bleuett into court because, due to the snow, the courthouse was already functioning with only a "skeleton staff" that day, and because the court did not wish to assume the responsibility of transporting a juror under dangerous road conditions. In addition, if Bleuett was driven to the courthouse, provisions would have to be made to return her to her home at the end of the day. The court further would not allow plaintiff to send a taxicab to retrieve Bleuett, because the day's proceedings were already late in beginning, and this request would cause more delay, and because the court did not find it appropriate for a party to provide transportation services to a juror. These findings show a legitimate basis for the court's decision to dismiss Bleuett and to seat instead one of the two alternate jurors available, and we find that the trial court did not abuse its discretion by dismissing Bleuett.

 Rush argues that the trial court nevertheless abused its discretion because of the "importance that Plaintiff be racially represented on the jury." Appellant's Br. at 35. The court, concerned about *Batson*[2] implications, had made a special effort to make sure

**2.** In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1985), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 106 S.Ct. at 1719. In *Reynolds v. City of Little Rock,* 893 F.2d 1004 (8th Cir.1990), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991), this court held that the *Batson* rule applies to government counsel in civil cases as well as in criminal cases.

that Bleuett, who is black, was on the original jury despite the government's inclination to strike her. I Trial Tr. at 155–56. The remainder of the jurors empaneled were all white. Timothy Rush is black, and his fact witnesses are all also black. Of the two police officers directly involved in the incident at issue, one is white and the other black. The defendant Board of Police Commissioners is a multi-racial group. *Batson,* however, applies to a government advocate's attempt to strike potential jurors because of their race, not to a court's decision to dismiss a seated juror for legitimate, non-racial cause. The court stated on the record a legitimate basis for Bleuett's dismissal, and the fact that she was the only black member of the jury does not invalidate that legitimate basis.[3]

More problematic are the court's comments to the jury regarding Bleuett's dismissal. The court's statements regarding the circumstances of Bleuett's empanelment and the court's views regarding the tendency of races to "stick together" are beyond inappropriate: they egregiously and obnoxiously flout even minimal standards of judicial propriety and integrity, and we strongly reprimand the court for engaging in behavior that has no place in the courts of the United States.

█ The plaintiff, however, failed to lodge an objection to the court's comments. When the complaining party has failed to object to the court's statements at trial, our review is for plain error only. *Cowens v. Siemens–Elema AB,* 837 F.2d 817, 823 (8th Cir.1988); *see* Fed.R.Civ.P. 51. Regardless of the impropriety of the court's statements, plain error is found only when the court's comments destroyed the overall fairness of the trial. *Harris v. Steelweld Equip. Co.,* 869 F.2d 396, 403 (8th Cir.), *cert. denied,* 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989); *Williams v. Fermenta Animal Health Co.,* 984 F.2d 261, 264 (8th Cir.1993). More specifically, we do not reverse the trial court for misconduct "unless it appears that the con-

duct complained of was intended or calculated to disparage the [plaintiff] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." *Id.* at 400 (internal quotations omitted). In addition, the complaining party must show that he was prejudiced by the misconduct. *Id.*

█ Counsel for the plaintiff did not object on the record to the court's comments, nor did he request a mistrial. The court offered to clear up any misunderstanding regarding his comments, but counsel rejected this offer. When asked by the court what he wanted the court to do, counsel replied that he wished to go on with the case. He then shifted the discussion to the topic of the first witness that day, effectively foreclosing further discussion of a remedy for the comments.

We find that the court's comments were not plain error and did not destroy the overall fairness of the trial. Although the comments were improper, they did not indicate a preference for the defendants over the plaintiff or disparage the plaintiff, nor did they reach the merits of the case or constitute advocacy in favor of either party. *See Williams,* 984 F.2d at 264 (comments not intended to suggest an opinion as to an issue in the case and comments not indicating a partiality for a party not plain error). We have often held that "a few improper comments are not necessarily enough to require reversal," *see, e.g., Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1330 (8th Cir. 1985), and have considered the weight of improper comments in the context of the length and complexity of the trial, *see id.* (court's comment in product liability case that he had "put air in a lot of tires, but [he] never had one blow up on [him]" not sufficient for reversal, because this was a minor incident in a lengthy trial); *Cowens,* 837 F.2d at 824 (comments considered in light of entire seven-volume trial transcript). In this case, we find that a single improper comment, during an eight-day trial, not reaching

---

3. The plaintiff also argues that we should follow *United States v. Tabacca,* 924 F.2d 906 (9th Cir. 1991). *Tabacca,* however, is readily distinguishable. In *Tabacca,* the court dismissed a juror after the jury had already retired for deliberation, leaving a jury of only eleven. *Id.* at 914. In the instant case, an alternate juror was available, and the number of jurors remained at six.

the merits of the case or indicating a partiality for a particular party, did not destroy the overall fairness of the trial or prejudice the plaintiff. We therefore find no plain error by the trial court.

## B. Discovery

■ Rush next argues that the trial court erred by denying his motions for default judgment and new trial on the grounds that the Board of Police Commissioners failed to respond to discovery requests and to court orders for document and witness production. These discovery requests, however, related to a failure to train claim against the Board arising from Officer Smith's shooting of Rush. In *Los Angeles v. Heller*, the Supreme Court held that, when a police officer is found to have inflicted no constitutional injury in a § 1983 suit, it follows that this finding is dispositive as to the liability of the supervising police commission and municipality as well. 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1985) (per curiam). The supervising authorities "were sued only because they were thought responsible for [the police officer's] actions; if the latter inflicted no constitutional injury on [plaintiff], it is inconceivable that [the city and its Police Commission] could be liable." *Id.*

The documents and witnesses requested by the plaintiff from the Board were relevant to establishing a claim against the Board for failure to train police officers in the use of firearms. This claim, however, is now moot, because the jury verdict finding no constitutional violation on the part of the individual officers eliminates the basis for the Board's liability. *See Robinson v. City of St. Charles, Mo.*, 972 F.2d 974, 977 (8th Cir.1992) (jury verdict awarding no damages to plaintiff in § 1983 suit against police officers rendered moot failure to train claim against the municipality). We find that any error regarding the course of discovery was harmless, be- cause the question of the Board's liability is now moot.

## C. Weight of the Evidence

■ Finally, Rush argues that the trial court erred by denying his motion for a new trial on the grounds that the jury verdict was against the weight of the evidence and resulted in a manifest injustice. We review the trial court's decision not to grant a new trial on these grounds for abuse of discretion. *White v. Pence*, 961 F.2d 776, 781 (8th Cir. 1992). A trial court, when considering a motion for a new trial on grounds that the verdict was against the weight of the evidence, may rely on its own reading of the evidence and assessment of witnesses' credibility in determining whether a manifest injustice has occurred. *Id.* at 780. This discretion is, however, limited. When the evidence is such that reasonable persons could differ as to the result, such as a direct conflict in credible and plausible evidence, the determination is properly left to the jury. *Id.* at 781 (citing *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187 (8th Cir.), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973)); *see Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404, 1409–10 (8th Cir.1987).

■ Testimony by plaintiff's and by defendants' witnesses as to exactly what happened after midnight on January 1 was in direct conflict. Plaintiff and his witnesses, members of his household, stated that plaintiff was in the house when shot. Defendant police officers and a neighbor stated that a figure resembling Rush was in the yard when shot, that he or his companion was shooting at the officers, and that the figure entered the house after the shooting. Each story is straightforward and credible. When "diametrically opposed testimony from credible witnesses" is at issue, the choice of which story to believe is to be made by the jury, not by the trial court.[4] *White*, 961 F.2d at

4. The court, in its order of June 1, unfortunately states that "after careful review of the evidence, the Court cannot find that there was not sufficient evidence to support [the] verdict." This language is that applicable to a motion for JNOV, not a new trial on the grounds that the verdict is against the weight of the evidence. In *White v.*

*Pence*, the trial judge expressed his confusion regarding whether he could make an independent reading of the evidence in a motion for new trial, and stated that he thought that he could not, but if he could, he would grant the motion due to manifest injustice. 961 F.2d at 778. We remanded the case, finding that had the court

781. We therefore find that the trial court did not abuse its discretion in denying plaintiff's motion for a new trial on the grounds that the verdict was against the weight of the evidence.

### III. CONCLUSION

For the above reasons, the denial of appellant's motions for a new trial and for default judgment is affirmed.

McMILLIAN, Circuit Judge, dissenting.

Because I believe that the trial judge's improper conduct in the present case constituted plain error, I respectfully dissent. The trial judge's handling of the dismissal of the lone African–American juror was reprehensible, and more than a nicely-worded reprimand is required to remedy the judicial misconduct in this matter.[1] Appellant, Timothy Rush, was denied the fundamentally fair trial that due process guarantees. Thus, the district court abused its discretion in failing to grant Rush's motion for a new trial. I would reverse and remand this case for the new trial that Rush deserves.

Rush, who is African–American, filed this civil rights action pursuant to 42 U.S.C. § 1983 claiming that two police officers used excessive force against him. Resolution of this matter required the jury to choose from two conflicting accounts of what happened during the early morning hours of January 1, 1990. Rush claimed that around the time of the incident, 12:37 a.m., he was in his home with his grandmother and his cousin. Meanwhile a friend, Michael Mayhorn, was in Rush's backyard, celebrating the New Year by firing a shotgun into the air. Rush's grandmother asked Rush to tell Mayhorn to stop firing the shotgun and to come inside. Rush approached the kitchen door, wearing only pajama bottoms, to ask Mayhorn to cease firing the shotgun. Rush testified that

while standing sideways bent over between the storm door and the wooden door and looking into the backyard, he was shot in the abdomen by one of the police officers. Immediately after being shot, Rush made his way to a telephone in the hallway of his home and called 911 for assistance. The testimony of Rush's grandmother and his cousin corroborated Rush's version of the facts.

The two police officers told a different story. They were dispatched to Rush's neighborhood in response to a report that shots had been fired. They claim that they were fired upon by a shotgun as they approached Rush's backyard. They saw two men standing below the rear steps of the entrance of the home. At trial, neither officer could identify Rush as having been one of the two men. Both officers did testify that the man firing the shotgun was wearing pants and a shirt. Officer Smith claimed that 25–31 shotgun blasts were fired at them and that the officers returned 13–16 shots before notifying the dispatcher of the situation. Smith testified that after he fired two shots, his first target slumped over, handed the shotgun to the other man, and entered the house through the rear steps.

Rush was indicted in connection with this incident on state charges of first degree assault, armed criminal action, and unlawful use of a weapon. However, these charged were later dropped. Robert Craddick, an assistant circuit attorney for the city, testified that he explained to Smith that the pattern of the bullet holes (i.e. holes made by shots fired by the police officers) and other physical evidence revealed inconsistencies in his version of the incident. Upon hearing this explanation of the weaknesses in the case, Smith offered to change his account and even admitted that Rush could have been inside the house when shot. After the memo

---

stated its reasons for its reading of the evidence, a new trial may have been warranted. *Id.* at 782. In this case, the trial judge used incorrect language in his denial of plaintiff's motion, but he states that he made a careful review of the evidence, and gives no indication that he had reason to find any of the witnesses incredible. Because, upon our review of the record, we find that a new trial is precluded in this case as one in which reasonable persons could differ as to

the result to be drawn from the evidence, the trial court's erroneous statement of the standard is harmless error. We, however, strongly encourage the court to take care to state the correct legal standards in future orders.

1. Of course, I am in full agreement with the majority opinion's strong reprimand.

of *nolle prosequi* was submitted on all charges, Smith tried to get Craddick to reinstate the charges because he feared that he would be sued if Rush was not prosecuted.

Even this brief review of the record clearly demonstrates the critical importance of the jury's assessment of witness credibility. "A trial judge must be especially cautious and circumspect in language and conduct during a jury trial. The judge must be fair to all parties and not do or say anything that might prejudice either litigant in the eyes of the jury." *Coast–to–Coast Stores v. Womack–Bowers*, 818 F.2d 1398, 1401 (8th Cir.1987). Every person who has the high honor to serve as a member of the judiciary must fervently adhere to the fundamental principles of judicial conduct because, as the Supreme Court has noted, "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his [or her] lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923–24, 38 L.Ed. 841 (1894); *accord Travelers Ins. Co. v. Ryan*, 416 F.2d 362, 364 (5th Cir.1969) ("By reason of his role, quickly observed by jurors, the judge is a figure of over-powering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question."). When viewed against the exacting requirements for proper judicial behavior, the trial judge's conduct in the present case falls far short of our standards.

While I am most concerned with the comments made by the trial judge in the presence of the jury, I will also discuss certain comments made by the trial judge to Rush's counsel outside of the hearing of the jury because it is important to understand the context in which the improper remarks were made to the jury in order to appreciate the gravity of the trial judge's misconduct. Moreover, it is appropriate to consider the record as a whole when conducting a review under the plain error standard. *United*

States v. Solomonson, 908 F.2d 358, 361 (8th Cir.1990).

The majority opinion explains that the trial judge denied the request of Rush's counsel to send a taxicab for Dorothy Bluett, the absent juror, because of a concern over delay and "because the court did not find it appropriate for a party to provide transportation services to a juror." These reasons were in fact proffered by the trial judge in the post-trial order denying Rush's motion for a new trial. *Rush v. Smith*, No. 91–1430C(2), slip op. at 4 (E.D.Mo. June 1, 1993) (Memorandum and Order). However, on the day of the trial in question, the trial judge held a different view. Speaking with counsel about his refusal to send a United States marshal to pick up Bluett, the trial judge said:

> You'll have to get your own jurors, it's ten o'clock, you've known about this situation since nine o'clock. If you felt like you wanted to do it yourself or get a cab or something like that and get her in, I would have no problem with that as long as there was no conversation with her on the way, but as it stands now, I intend to proceed with what jurors I have as long as I have six.

Joint Appendix at 156. In my view, it was wholly unreasonable to expect Rush's counsel to make any sort of contact with a juror outside the courtroom without first seeking permission of the court. For the trial judge to base his refusal on counsel's one-hour delay while waiting for the trial judge to arrive, is, to my mind, arbitrary and unfair.[2]

After the trial judge made these statements, Rush's counsel asked to make a statement on the record with regard to the dismissal of the juror. His remarks, in part, were as follows:

> Mr. Singer [Rush's counsel]: We have the Marshal here, had agreed and was beginning on his way to pick up this juror when the Court informed and indicated to him not to. We were then told that the Court would address this matter when the Judge arrived. We were here for the scheduled motions at a quarter to nine this morning

**2.** I see no reason why the trial judge could not have allowed Rush's counsel to send a cab to pick up the juror, provided that defendants had

no objection and that the juror did not know who paid for the transportation.

and the Court has just arrived here. We do not know our juror lists have been taken, we don't know where she lives. We would be in a position of picking up a juror in this case, which would make a contact with the Plaintiff. Judge, this is a very serious matter. She was left on the jury with deference to [a *Batson*[3] motion] and she's an elderly woman and she informed the Court that her only transportation here was public transportation. It's—that is a very serious prejudice to our client's case. . . .

Joint Appendix at 156–57.

Rush's counsel then emphasized the hardship caused by the inclement weather[4], and stated that it was his understanding that the other divisions of the courthouse were not meeting that day, and that the courthouse had in fact been closed by the Chief Judge of the Eastern District of Missouri. The trial judge then told counsel that his information was not correct regarding the status of courthouse activity and admonished counsel that "you better get your facts straight." The following exchange occurred immediately thereafter:

Mr. Singer: Well, Judge the information I had received was from your staff.

The Court: Okay. Well, that's not true. You get information from me if you will, and I've tried to give you accurate information.

Mr. Singer: They were here.

The Court: Well, now you got that dig in twice. I'm an old man. I'm seventy-six years old, I've got a wife that's in charge of [a local hospital department], she got into a ditch this morning. I went out, put a chain on my car, pulled her out of the ditch. I've done all the things that I can do to preserve my family and to maintain this trial and I don't need any snide remarks about the time of my arrival.

Joint Appendix 158–59. I have included this excerpt from the trial transcript because it clearly demonstrates the trial judge's inappropriate demeanor. When a judge dons the robe, he or she must put aside all personal preoccupations, no matter how troubling they

may be. In the present case, the trial judge let his personal life affect his judicial temperament, and as a result, he exhibited undue hostility toward Rush's counsel, who was only acting in the best interests of his client.

In concluding that there was no plain error in the present case, the majority opinion fails to consider the hostility, as evidenced by this exchange, the trial judge exhibited toward plaintiff's counsel immediately prior to the trial judge's improper comments about racial solidarity to the jury. A review of the transcript and the context surrounding the trial judge's improper comments demonstrates that, under the circumstances, the restrained and somewhat awkward attempt by Rush's counsel to suggest corrective action to the trial judge was an understandable approach. *See* op. at 1199. In light of the events of the day in question, I would deem the attempt on the part of Rush's counsel to point out the trial judge's error without further provocation to be sufficient to qualify as a contemporaneous objection. From my perspective, however, whether counsel lodged a contemporaneous objection is of no great consequence because, as I have indicated, it is my opinion that the trial judge's improper comments constituted plain error.

Shortly after the exchange between Rush's counsel and the trial judge, the jury was called into the courtroom, and the trial judge made the following opening remarks:

Your eyeballs will indicate that your Juror Number Two is absent and we've previously discussed that, so we're going to proceed without her. Something just occurred to me, though, when I was being mildly scolded by the Plaintiff's attorneys for starting court late, that it was this Court's insistence or relative insistence that we have a black juror in this case, that put the black juror to the missing juror, Dorothy Mae Bluett in the box. I told all of you and I'm going to say this in front of the jury, it doesn't make any difference. It's a truth and I'm not afraid of the truth, but I was sincerely afraid of striking the only two blacks that were on that jury, that the Courts of Appeals would look askance at anybody being able to single out a particu-

---

**3.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1985).

**4.** The record provides that St. Louis received between 10 to 14 inches of snow.

lar race and eliminating them from consideration of this jury, so I, and I'm gonna take credit for this, I'm sorry. I've got to, I've got to preserve the justice and pursuit of justice by this Court, prevailed upon the City to put at least one of those black ladies on this panel so that Mr. Rush would be at least represented ethnic-wise or race-wise. I just, I'm not a damn fool. I haven't been around here for seventy-six years and not found out that the races have a tendency to stick together and that may be good or bad, but whatever it is, it exists.

Joint Appendix 160–61. I cannot overstate the injudiciousness of these remarks. In a situation where all the court had to do was tell the jury that a juror was unable to attend and that an alternate would take her place, the trial judge recklessly launched into this improper commentary. His remarks would be shocking even if made in chambers, but before a jury, they are unfathomable.

Before addressing the impropriety of the trial judge's comments, I first note that the trial judge should not have told the jury that Rush's attorney "scolded" him for being late. The transcript reveals that Rush's counsel did nothing of the sort. Moreover, even if Rush's counsel had scolded him, the trial judge should have refrained from making such a reference because of the danger that such characterization might unfairly disparage Rush and Rush's counsel in the jury's eyes. However, this indiscretion pales in comparison to the comments which followed.

Most importantly, the trial judge committed plain error by telling the jury that the races have a tendency to stick together. The irreparable damage caused by the utterance of this polarizing remark to an all-white jury hearing a civil rights case brought by an African–American whose corroborating witnesses were also African–American is self-evident. Such insidious notions have no place in our society, let alone our courtrooms. While I remain optimistic that some day such thinking will be uniformly greeted with incredulity and contempt, we have not progressed so far that I can rest assured the trial judge's

comments fell upon deaf ears. Whether intentional or not, the trial judge's remarks infected the courtroom and plainly deprived Rush of a fair trial.

While the trial judge's improper comments were not directed at the merits of Rush's case, I am gravely concerned they might have effectively undermined the credibility of his witnesses. A similar case was considered by a New York state appeals court over thirty years ago in *People v. Burris*, 19 A.D.2d 557, 241 N.Y.S.2d 75 (1963). That court's appreciation of the inequity of weighing testimony on the basis of racial similarity is instructive:

> In our opinion, the defendant did not receive a fair trial. Both the court and the assistant district attorney suggested to the jury that the identification of the defendant by the complaining witness should be weighed in the light of the fact that both defendant and the witness were negroes. We have firmly rejected the weighing of testimony on the basis of racial similarity or dissimilarity of witnesses. As identification here turned on the testimony of a single witness, a new trial is necessary to correct the possible effect on the jury of an argument which should be eschewed as false in its premise and divisive in its result.

*Id.* (citation omitted). The wisdom of that court's decision is compelling. While the trial judge in the present case did not expressly state that Rush's witnesses should be discredited, I believe that the danger of his implication demands a new trial as well. Even an inadvertent and indirect suggestion that Rush and his corroborating witnesses gave a consistent account of the events because of racial solidarity, and not because of their sworn duty to tell the truth, is completely intolerable.[5] Moreover, because of the impracticality of determining what effect the racial remark had on the jury, I believe that the requirement of a showing of actual prejudice is inappropriate. Again, I point to the result in *Burris*. In that case, the court realized the importance of witness credibility and therefore determined that the "possible

---

**5.** In addition, I believe the majority opinion may have relied upon a misreading of our precedent. The majority opinion states that "we do not reverse the trial court for misconduct 'unless it

appears that the conduct complained of was intended or calculated to disparage the [plaintiff] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the

effect" on the jury was sufficient to merit a new trial. I believe that on the particular facts of this case, the potential for prejudice in the minds of the jurors was so great that no actual prejudice need be shown.

Because I am firmly convinced that the trial judge's error in this case substantially affected the constitutional rights of Timothy Rush by destroying the fundamental fairness of the entire proceeding, I would reverse and remand for a new trial. Accordingly, I dissent.

merits.'" Maj. op. at 1202, *citing Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 400 (8th Cir.) (*Harris*), *cert. denied*, 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989). This statement appears to indicate that we will only reverse for intentional judicial misconduct. However, the portion of the majority opinion's statement which quotes *Harris* is derived originally from *Goldstein v. United States*, 63 F.2d 609 (8th Cir.1933) (*Goldstein*). The quoted excerpt appearing in the majority opinion omitted the following introductory clause: "An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless...." *Id.* at 613. The omitted section, however, is crucial to a proper understanding of the precedent. The *Goldstein* court did not say that we *will not* reverse for

judicial misconduct which is unintentional. Rather, it wisely provided that in the absence of intentional misconduct, the court should be "slow" to reverse for alleged misconduct of the trial court. This language was quoted in its entirety in *La Barge Water Well Supply Co. v. United States*, 325 F.2d 798 (8th Cir.1963). However, in *Harris*, the case relied upon by the majority opinion, the opinion did not include the first clause of the sentence and employed the altered version. Common sense tells me that there may be instances, though rare, where a court's misconduct may be plain error and yet unintentional. The desire to preserve this possibility accounts for the approach of the *Goldstein* court to the question of judicial misconduct.