**UNITED STATES of America, Plaintiff,**

v.

**George VENTURA, Defendant.**

**No. 98–20004–01–EEO.**

United States District Court,
D. Kansas.

Aug. 13, 1998.

George Ventura, Shawnee, KS, pro se.

Gary W. Hart, David B.B. Helfrey, Helfrey, Simon & Jones, P.C., St. Louis, MO, for George Ventura.

Kurt J. Shernuk, Office of U.S. Attorney, Kansas City, KS, for U.S.

### MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on defendant's motion for judgment of acquittal or, in the alternative, for a new trial (Doc. # 69). At trial, the court reserved ruling on defendant's motion for judgment of acquittal at the close of all the evidence until after the jury's verdict. On April 29, 1998, a jury found defendant not guilty on count 1 of the indictment and guilty on counts 2 through 6. Defendant has filed a brief and a reply in support of his motion and the government has filed an opposition brief. On August 5, 1998, the court heard oral argument on defendant's motion. After careful consideration of the trial record and the arguments and authorities set forth by counsel, the court is prepared to rule. For the reasons set forth below, defendant's motion for judgment of acquittal will be granted. Accordingly, the court need not address defendant's motion for a new trial.

### Factual Background

This is a bank fraud case involving a series of transactions between defendant George

Ventura and the Commercial State Bank in Bonner Springs, Kansas ("CSB"). The second superseding indictment charged defendant with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371, 1344 (count 1) and executing or attempting to execute a scheme to defraud a bank in violation of 18 U.S.C. § 1344 (counts 2–6). As noted above, the jury found defendant not guilty on count 1 and guilty on counts 2 through 6.

Mr. Ventura operated a business called Mid–America Exotic Auto Sales located in Overland Park, Kansas ("Mid–America"). Mid–America primarily bought and sold new and used luxury/exotic automobiles. Mr. Ventura, through Mid–America, obtained a $750,000 line of credit from CSB for the purchase of automobiles for resale. Mid–America pledged to CSB as collateral all of the vehicles which were financed through the bank, certain real estate owned by Mr. Ventura, and the personal guarantees of Mr. Ventura and his wife.

Mr. Robert Geekie operated a similar luxury and exotic automobile dealership in Illinois called Midwest Autohaus. The indictment alleges that Mr. Ventura and Mr. Geekie agreed to use Mid–America's line of credit at CSB to finance Midwest Autohaus' purchase of automobiles. CSB was unaware of this alleged agreement and was under the belief that Mid–America was using CSB's funds to purchase specific vehicles. The indictment alleges that between January 1, 1994, and May 17, 1995, there were approximately 512 transactions between Mid–America and Midwest Autohaus where Mid–America loaned funds it obtained from CSB to Midwest Autohaus. The transactions generally proceeded as follows. After Geekie found a car to purchase, Geekie would fax a bill of sale form to Mid–America. Mid–America would issue a check to Midwest Autohaus for the purchase price stated on the bill of sale and would note on the memo portion of the check that the check was for the purchase of that specific vehicle. Mid–America would send this check to Geekie by overnight mail. Shortly thereafter, Mid–America would fax a request for financing to CSB. Mid–America generally requested financing for $500 more than the purchase price of each vehicle.

After CSB received Mid–America's request for financing, CSB would complete a promissory note and security agreement for Mid–America and deposit the requested funds to Mid–America's bank account. CSB permitted defendant to sign the promissory notes in blank ahead of time so that the notes could be processed timely by the bank. The promissory note provides in part that defendant gives the bank a security interest in the vehicle being purchased. The promissory note includes a description of the specific vehicle being financed by the bank.

Once Midwest Autohaus received payment from a third party buyer for an automobile, Midwest Autohaus would issue a check to Mid–America for the amount of the loan, interest accrued on the loan from CSB, and one half of the net profit from the sale. Mid–America deposited the checks from Midwest Autohaus into its account at CSB. Between January 1, 1994, and May 15, 1995, defendant, through Mid–America, received approximately $560,368 in excess of the acquisition cost of the vehicles and interest accrued on the loans from CSB to Mid–America.

Beginning sometime in 1994, and unknown to the defendant, Geekie was engaged in a check kiting scheme involving a bank in San Antonio, Texas. In carrying out the arrangement described above, Midwest Autohaus, in May 1995, sent insufficient fund checks to Mid–America totaling approximately $1.64 million. Defendant deposited these checks into Mid–America's account at CSB, in part to pay off several outstanding loans on Mid–America's line of credit. CSB sent defendant a list of the Midwest Autohaus' checks that were returned. Defendant sent the list back to the bank with a completed column titled "date we purchased car from Midwest."

In late May 1995, Geekie wired $477,800 to CSB which was deposited to Mid–America's account leaving the account with a negative balance of $1,015,309. CSB sought possession from Mid–America of the vehicle collateral described in the then unpaid promissory notes at the bank. Mid–America was unable to produce six vehicles described in the promissory notes totaling $409,500 and which involved Mid–America transactions with Midwest Autohaus.

The theory of the government's case is that defendant did not use the loan proceeds to purchase the vehicles specified in the bank notes, but rather simply financed Midwest Autohaus' purchase of these vehicles. Defendant maintains that Mid–America did not loan funds to Midwest Autohaus, but rather Mid–America simply bought each vehicle from Midwest Autohaus and then resold it to Midwest Autohaus, usually in less than one week. Defendant claims that the vehicles basically were consigned from Mid–America to Midwest Autohaus.

### Standards For Motions For Judgment Of Acquittal

■ Defendant seeks a judgment of acquittal pursuant to rule 29 of the Federal Rules of Criminal Procedure. In considering motions for judgment of acquittal, we must "view the evidence in the light most favorable to the government and then determine whether there is sufficient evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." *United States v. White,* 673 F.2d 299, 301 (10th Cir.1982). In rendering its verdict, the jury was entitled to consider both direct and circumstantial evidence, as well as all reasonable inferences that could be drawn therefrom, in the light most favorable to the government. *See United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In considering a motion for judgment of acquittal, we are prohibited from weighing conflicting evidence or considering the credibility of any witnesses. *See Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). At the same time, the evidence supporting the conviction "must be substantial and must not raise a mere suspicion of guilt." *United States v. Brown,* 995 F.2d 1493, 1502 (10th Cir.) (citing *United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir.1987)), *cert. denied,* 510 U.S. 935, 114 S.Ct. 353, 126 L.Ed.2d 317 (1993). Acquittal is proper if the evidence is "so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White,* 673 F.2d at 301.

### Analysis

■ Counts 2 through 6 of the indictment each charge a violation of Title 18, United States Code, Section 1344(1), which provides in part that "Whoever knowingly executes, or attempts to execute, a scheme or artifice—to defraud a financial institution," shall be guilty of an offense against the laws of the United States. The government must prove the following essential elements beyond a reasonable doubt: (1) the defendant knowingly and intentionally executed, or attempted to execute, a scheme or artifice to defraud the Commercial State Bank; (2) the defendant did so with the intent to defraud the Commercial State Bank; and (3) the Commercial State Bank was a financial institution, then insured by the Federal Deposit Insurance Corporation. Jury Inst. No. 15; *see* 18 U.S.C. § 1344(1); *United States v. Rackley,* 986 F.2d 1357, 1360–61 (10th Cir.), *cert. denied,* 510 U.S. 860, 114 S.Ct. 173, 126 L.Ed.2d 132 (1993); *United States v. Young,* 952 F.2d 1252, 1256–57 (10th Cir.1991). The government and defendant stipulated that the Commercial State Bank was insured by the Federal Deposit Insurance Corporation. *See* Tr. at 717–18. For the reasons set forth below, the court finds that the government failed to present sufficient evidence to satisfy the first two elements of the crime of bank fraud.

### I. Scheme Or Artifice To Defraud.

■ The bank fraud statute has been construed liberally to encompass a variety of activities that undermine the integrity of the banking system. *See Rackley,* 986 F.2d at 1361; *Young,* 952 F.2d at 1256. The schemes covered by the bank fraud statute are "limited only by a criminal's creativity." *United States v. Norton,* 108 F.3d 133, 135 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 66, 139 L.Ed.2d 28 (1997); *see United States v. LeDonne,* 21 F.3d 1418, 1426 (7th Cir.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994). Several courts have noted that while the phrase "scheme to defraud" has not been precisely defined, a scheme certainly may include misrepresentations. *See Young,* 952 F.2d at 1256; *United States v. Goldblatt,* 813 F.2d 619, 624 (3d

Cir.1987). A false representation by an individual as to the purpose of a loan may be sufficient to support a conviction of bank fraud under section 1344(1). *See United States v. Saks,* 964 F.2d 1514, 1519 (5th Cir.1992); *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992); *United States v. Clark,* 765 F.2d 297, 302 (2d Cir.1985); *United States v. Shively,* 715 F.2d 260, 267 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984).

■ To find a scheme or artifice to defraud, the government must establish that defendant engaged in or attempted to engage in a pattern or course of conduct designed to deceive the Commercial State Bank into releasing property, with intent to victimize Commercial State Bank by exposing it to an actual or potential loss. *See Young,* 952 F.2d at 1256–57; *United States v. Sapp,* 53 F.3d 1100, 1102 (10th Cir.1995) (explaining scope of *Young* holding), *cert. denied,* 516 U.S. 1082, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996); *United States v. Brandon,* 17 F.3d 409, 424 (1st Cir.), *cert. denied,* 513 U.S. 820, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994); *United States v. Lemons,* 941 F.2d 309, 316 (5th Cir.1991).

■ Banks are in the business of assuming risks. Section 1344(1) of the bank fraud statute, however, prohibits individuals from exposing a bank to a risk of loss that the bank did not knowingly assume. Jury Inst. No. 16; *see United States v. Schnitzer,* 145 F.3d 721, 735 (5th Cir.1998) (bank fraud not established where the risk of default associated with the transaction "was no different than the risk of default that accompanies every loan properly made to a creditworthy individual"); *United States v. Lemons,* 941 F.2d 309, 316 n. 3 (5th Cir.1991) (government must prove that the bank did not knowingly accept a risk of loss created by the scheme to defraud); *United States v. Solomonson,* 908 F.2d 358, 364–65 (8th Cir.1990) (actual loss is not required).

The indictment alleges Mr. Ventura's scheme to defraud consisted of several misrepresentations to CSB, including (1) misrepresenting the purchase price of each vehicle by $500 when requesting to draw on his line

of credit, (2) misrepresenting that he would use the loan proceeds to purchase cars on behalf of Mid–America for resale, (3) failing to disclose that he would use the loan proceeds to finance purchases of vehicles by an undisclosed third party, and (4) representing that checks sent by Midwest Autohaus to Mid–America were for the purchase of vehicles from Mid–America when, in fact, such checks represented payments on the proceeds of the undisclosed loan from Mid–America to Midwest Autohaus.

■ The government's allegation that defendant's scheme to defraud consisted of, at least in part, adding $500 to the purchase price of each vehicle when requesting financing from CSB is unsupported by the trial record. The government relies on the testimony of Larry Ellington, CSB's President since late 1993, and Debra Breuer, a bank employee who handled Mid–America's line of credit until she left CSB in March 1993. Mr. Ellington testified that the bank's understanding was that the individual notes were for 100% of the purchase price of each car. *See* Tr. at 801. Of course, Mr. Ellington also testified that he had no day-to-day knowledge of Mid–America's transactions and that "I am not saying that at times there would not have been $500 put into Mid–America['s account], I don't know." Tr. at 772. Ms. Breuer, who was not employed at CSB during the time period of the alleged scheme to defraud, testified that she understood that defendant requested financing for the purchase price of each vehicle and she did not recall discussing a "PAC"[1] with defendant. *See* Tr. at 934.

No reasonable jury could find a scheme to defraud based on the speculative testimony of Ellington and Breuer, particularly in light of the testimony of the two bank employees who worked most closely with Mid–America during the time period of the alleged scheme to defraud. The bank employee who processed Mid–America's loan requests during 1994 and 1995, Debora Vitt, testified that she recalled that Mid–America requested financing on vehicles for the purchase price plus $500, after reviewing several transactions.

---

1. Defendant apparently referred to the additional $500 financed as "PAC" which represented a portion of defendant's overhead and operating expenses.

*See* Tr. at 429–36, 447–48. Ms. Vitt also testified that the $500 added to the purchase price was of no particular concern to her as a bank employee and that the additional $500 was openly communicated to her. *See* Tr. at 435, 447–48. Further, the bank officer who oversaw Mid–America's loans during the pertinent time period, Fred Stanbrough, testified that no loan requirement limited Mid–America to requesting only the amount being paid for the vehicles. *See* Tr. at 488, 490–91. Finally, Professor Warner testified that CSB willing assumed the risk that the amount financed was greater than the purchase price of each vehicle and that CSB was aware from its own files that Mid–America added $500 to the purchase price of each vehicle when requesting financing. *See* Tr. at 1041–47. Based on the trial testimony, and viewing the evidence in the light most favorable to the government, the court concludes that there is insufficient record evidence for a reasonable jury to conclude that defendant defrauded CSB by adding $500 to the purchase price of each vehicle when requesting financing from CSB.

■ Defendant's other alleged misrepresentations all concern defendant's failure to disclose his alleged financing relationship with Geekie to CSB. To find a scheme to defraud based on any of these misrepresentations, the jury necessarily had to conclude that a financing relationship existed between defendant and Geekie such that defendant did not own the vehicles. The primary issue, as counsel for the government concedes, is whether defendant used the money obtained on Mid–America's line of credit to purchase vehicles as specified in the bank notes. If defendant did not use the loan proceeds from CSB to purchase the vehicles specified in the bank notes, then the bank did not have a

security interest in each vehicle. Accordingly, the bank would face a potential risk of loss that it did not knowingly assume.[2] *See* Tr. at 565. Defendant's own expert concedes this point. *See* Tr. at 1063–65. Nevertheless, we find that the evidence overwhelming supports the conclusion that defendant did in fact purchase the vehicles and therefore could convey the vehicles as collateral for the loans from CSB.

The government points to the following evidence of a financing relationship between defendant and Geekie: (1) Geekie's testimony that defendant was using his floor plan line of credit at CSB to finance Geekie's purchase of vehicles, (2) the different "paper trails" in defendant's files between the alleged financing transactions and other transactions consisting of purchases and sales, and (3) defendant's failure to disclose to his accountant that he had a consignment relationship with Geekie. We start with Geekie's testimony. Geekie testified that defendant essentially financed the vehicles on Geekie's lot. *See* Tr. at 179 ("we struck a deal where he [George Ventura] would essentially finance my inventory.... [I]f I could find a car and had it sold, he would send me the money to do that and we would split the profit. That was essentially the deal."). Geekie's testimony, however, omits a key element, *i.e.*, whether defendant had an ownership interest in the vehicles on Geekie's lot. As counsel for defendant correctly points out, whether Geekie characterized the transactions as financing or consignment is not dispositive as to the issue of whether defendant had an ownership interest in the vehicles. The labels attached to the transactions either by Geekie, defendant, or an outsider looking

---

2. Defendant contends that no scheme to defraud existed because of the value of the other collateral defendant pledged as security for the line of credit. The bank agreed to a $750,000 floor plan line of credit on the condition that the loan was secured by the cars being financed plus the additional collateral pledged by defendant. Regardless of the value of the other collateral, if the loan was not in fact secured by the cars because defendant did not purchase the cars, the bank was placed at a risk of loss that it did not knowingly assume. *See United States v. Saks,* 964 F.2d 1514, 1519 (5th Cir.1992) (rejecting defendants' argument that they could not have

committed bank fraud as a matter of law because "the loan they obtained was amply secured, and they assumed a legal obligation to repay it"). The government does not have to establish that a loss to the bank was likely—only that the bank was put at a potential risk of loss. *See id.* (citing *Lemons,* 941 F.2d at 316 n. 3); *United States v. Solomonson,* 908 F.2d 358, 363–64 (8th Cir. 1990). Although evidence of the amount of the other collateral is not relevant to the issue of whether defendant executed or attempted to execute a scheme to defraud, such evidence may be relevant on the issue of defendant's intent.

at the transactions, are not as critical as the actual substance of the transactions.

The government also relies on Geekie's testimony that Mr. Ventura suggested the possibility of a partnership to ease the problem of not having titles in Kansas City and to disclose to the banks that approximately 90% of Mid–America's business was being done in Illinois. *See* Tr. at 220–21. Again, this testimony does not show whether Mr. Ventura had an ownership interest in the vehicles on Geekie's lot. Mr. Geekie suggested that he believed the alleged fraud was defendant's and Geekie's failure to disclose to CSB that nearly all of defendant's inventory was at Geekie's lot in Illinois and not at defendant's lot in Kansas. *See id.;* Tr. at 349–50. CSB already knew, however, that titles quite often never came to the bank, that a very large portion of defendant's business was being conducted with Midwest Autohaus, and that a significant number of the vehicles Mid–America financed through CSB were kept on Midwest Autohaus' lot in Illinois. *See* Tr. at 488, Ex. 5: Jan. 22, 1993 Floor Plan Check (indicating that 8 of 22 cars floor planned were located at "Bob Geekie—Chicago, Ill."). Moreover, CSB employees testified that the bank did not care about the identity, or number, of defendant's suppliers or customers. *See* Tr. at 488–91, 796–98. In sum, Geekie's testimony suggests that Geekie viewed the transactions with defendant essentially as financing but Geekie's testimony does not address whether defendant or Geekie actually owned the vehicles involved in the pertinent transactions.

The government next points to the "substantially different paper.trails" between the alleged financing deals and the deals where a third party was involved either as the seller to or purchaser from Mid–America. The government asserts that the absence of documents relating to the transportation of the vehicle, title to the vehicle, and condition of the vehicle is evidence that the transactions between defendant and Geekie were merely financing deals. Initially, we note that the two types of transactions simply are not comparable because in the transactions involving a third party the vehicle generally came to defendant's lot in Kansas City so information

on transportation and condition of the vehicle was included in Mid–America's deal envelope. A more telling comparison is between the deals where Mid–America both bought a vehicle from Midwest Autohaus and sold the same vehicle back to Midwest Autohaus in 1995 and those same type deals in 1992, prior to the alleged financing arrangement. This comparison reveals nearly identical documentation between the purchase/sale transactions in 1992 and the alleged financing transactions in 1995. For the 1992 transactions, Mid–America generally included the following documents in its deal envelope: a copy of the note, a copy of the deposit slip indicating the car sold, a copy of the note with a "paid" stamp, a faxed sales invoice from Midwest Autohaus, and a Mid–America purchase order. *See, e.g.,* Exhibit 538: deal envelopes 1368, 1369, 1370, 1381, 1382, 1392, 1395. For the alleged financing transactions in 1995, Mid–America included the very same documents in its deal envelope with the exception of the purchase order, which was not included.[3] Kathleen Gibson, an employee of Mid–America, testified that at some point in 1993 or 1994 she suggested to defendant that the purchase order did not need to be completed, due to the number of deals between Geekie and defendant, the significant amount of paperwork involved, and the fact that the purchase order was repetitive. *See* Tr. at 628, 646. No evidence suggests that Mid–America changed its procedure with respect to the purchase orders because of a change in the relationship between Geekie and defendant. We also note that, for a significant portion of the deals in 1992, the purchase order was unsigned and/or apparently was never sent to Midwest Autohaus. *See, e.g.,* Exhibit 538: deal envelopes 1368, 1369, 1370, 1405, 1407, 1413, 1414, 1415; Tr. at 292. Despite the government's argument to the contrary, the record evidence reveals no significant difference in the documentation between the alleged financing transactions in 1994 and 1995 and the purchase/sale transactions in 1992.

Finally, the government points out that defendant's accountant, Robert Thomas, did not know of any consignment relationship

---

**3.** For a few of the transactions in 1992, the deal envelopes did not even include a copy of Mid-America's purchase order. *See, e.g.,* Exhibit 538: deal envelopes 1372, 1373.

between defendant and Geekie. Mr. Thomas apparently asked defendant about the increase in activity between Mid–America and Midwest Autohaus and the daily crossing of checks between the two entities. Mr. Thomas explained that defendant said he would frequently purchase a car for a buyer but the buyer would not complete the sale, so Mid–America would sell the car back to Midwest Autohaus. *See* Tr. at 986–88. Defendant's alleged statement to his accountant is inconsistent with either a financing or consignment arrangement. Defendant's alleged statement certainly is not dispositive as to the issue of whether defendant or Geekie owned each vehicle.

In sum, the government's evidence at most tends to establish that Geekie viewed the transactions with Mid–America essentially as financing deals, Mid–America generally did not prepare purchase orders for these transactions, and defendant did not reveal to his accountant the true nature of these transactions. The government did not present any evidence, however, that would establish beyond a reasonable doubt that defendant did not have an ownership interest in the vehicles. On the other hand, defendant presented the following evidence that he had an ownership interest in each vehicle: (1) Geekie, at the request of defendant, sent defendant a bill of sale form for each vehicle identifying Mid–America as the purchaser, (2) Geekie did not care how the deals were structured so long as he got money to carry on his business of buying and selling cars, (3) defendant or his employees noted each transaction as a purchase of a specific vehicle on each check sent to Geekie, (4) defendant or his employees identified each deal with Geekie as a purchase and sale on the daily logs and deal envelopes maintained by Mid–America, (5) defendant or his employees identified each deal as a sale to Geekie on the Kansas Department of Revenue monthly sales reports, (6) Professor Warner testified that defendant had an ownership interest in the vehicles under the Uniform Commercial Code based on the documentation in defendant's file and the expressed intent of the parties, (7) defendant bore the risk of loss on the alleged financing transactions with Geekie, (8) Geekie admitted that he had possession of vehicles belonging to Mid–America

when his business closed in May 1995, and (9) Geekie testified that he maintained insurance coverage on defendant's vehicles kept on Geekie's lot pursuant to the parties' consignment agreement, and Geekie increased this insurance coverage in February 1995.

Defendant's expert witness, Professor Warner testified that in a hypothetical dispute as to ownership of the vehicles, defendant would prevail over Geekie. *See* Tr. at 1082–84. Professor Warner relied in part on the extensive documentation in defendant's files evidencing that each vehicle was purchased from Midwest Autohaus and then resold to Midwest Autohaus. The documentation of a purchase and sale included Midwest Autohaus' bill of sale sent to Mid–America, the memo on defendant's check to Midwest Autohaus, Mid–America's daily logs, Mid–America's deal envelopes, and Mid–America's monthly sales reports. No documentation in defendant's file suggests a financing arrangement.

Professor Warner also based his conclusion on the fact that defendant bore the risk of loss in the event a car sold for less than or the same amount as the purchase price. It is well established that risk of loss is one of the most critical factors in determining ownership. *See, e.g., American Broadcasting Companies, Inc. v. United States,* 129 F.3d 1243, 1245 (Fed.Cir.1997) ("[A] taxpayer will be treated as having an ownership interest to the extent that his capital is at risk....") (citation omitted); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1531 (11th Cir.1991) (" 'risk of loss' is one of the criteria for determining ownership."); *Freede v. C.I.R.,* 864 F.2d 671, 676 (10th Cir.1988) ("Risk of loss often has been used as an indicia of an ownership interest."), *cert. denied,* 493 U.S. 810, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989). If defendant and Geekie truly had a financing arrangement, Geekie obviously would pay the interest charges on vehicles that were purchased and sold for the very same price. *See* Tr. at 1034–35, 1078. However, according to defendant's expert, and as the government concedes, defendant, not Mr. Geekie, paid the interest charges on the transactions during 1994 and 1995 when cars were purchased and sold for the same price.

*See, e.g.,* Ex. 542.01, 544.01, 545.01, 545.02; Tr. at 877–78, 1034–37.

Professor Warner's testimony essentially was uncontested by the government. The government did not offer its own expert. The government merely argued that defendant's expert did not talk to Geekie or defendant to ascertain if there was any oral financing agreement which provided that Geekie actually owned the vehicles. The government's theory that such a financing agreement existed is purely speculative and utterly inconsistent with the documentation maintained in defendant's file, including the bill of sale form faxed by Geekie. Geekie did not testify on the issue of ownership or any of the specific terms of the so called financing deal which related to ownership. In fact, Geekie testified that he was not concerned with the specifics of any deal with defendant so long as he could continue his business of buying and selling cars. *See, e.g.,* Tr. at 292 (Geekie didn't care about the paperwork involved, defendant dictated to Geekie how he wanted the transactions to proceed, defendant required that Geekie send defendant a bill of sale for every car).

Defendant's ownership of the vehicles also is established by Geekie's purchase of insurance for defendant's vehicles on Geekie's lot. Defendant and Geekie executed a consignment agreement in 1992 which stated in part that "Midwest agrees to provide full coverage insurance at their own cost on these autos consigned from Mid–America." Ex. 460. In turn, Geekie purchased insurance and named Mid–America as loss payee and the policyholder of the insurance. *See* Tr. at 319–22; Ex. 461. In February 1995, Geekie increased his insurance coverage to defendant's benefit despite Geekie's testimony that very few vehicles were on consignment in 1995. *See* Tr. at 322, 362. No evidence was presented at trial that Geekie maintained the insurance or increased the amount of the insurance coverage pursuant to any financing arrangement. Accordingly, there is no logical reason for Geekie to have increased the insurance coverage on the vehicles in 1995 to benefit defendant, other than to protect defendant's ownership interest in the consigned vehicles. The conclusion that defendant owned the vehicles is further supported by Geekie's admission that he had possession of vehicles belonging to Mid–America at the time Midwest Autohaus closed in May 1995.

The record evidence establishing defendant's ownership interest in the vehicles is overwhelming. A jury's finding that defendant did not have an ownership interest in the vehicles would simply be a guess or mere possibility based on the record evidence. *See United States v. Jones,* 49 F.3d 628, 632–33 (10th Cir.1995). The evidence of defendant's lack of ownership in the vehicles is so meager that no reasonable jury could find defendant guilty beyond a reasonable doubt. *See White,* 673 F.2d at 301. For the above reasons, the court concludes that no reasonable jury could find beyond a reasonable doubt that defendant executed, or attempted to execute, a scheme to defraud the Commercial State Bank.

## II. Intent To Defraud.

■ In the absence of proof of an alleged scheme to defraud or any misrepresentations by defendant, no reasonable jury could find that the defendant had the requisite intent to defraud CSB. *See United States v. Yoon,* 128 F.3d 515, 523–24 (7th Cir.1997) ("Because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension.") (citation omitted); *United States v. Smith,* 133 F.3d 737, 743 (10th Cir.1997) ("Intent [to defraud under mail and wire fraud statute] may be inferred from a variety of circumstantial evidence, including the defendant's misrepresentations and knowledge of false statements."), *cert. denied,* —— U.S. ——, 118 S.Ct. 2306, 141 L.Ed.2d 165 (1998). Moreover, the evidence at trial clearly suggests that defendant did not intend to put CSB at a risk of loss that CSB did not knowingly accept. Defendant, in advance of the loans in question, irrevocably committed to CSB collateral independent of the vehicles specified in the notes which was valued at approximately $3.5 million, well in excess of his $750,000 line of credit. *See* Exs. 7, 8, 444,

445. Defendant's estimated net worth shortly before the bad check incident in May 1995 was $3.8 million. *See* Ex. 445. Defendant also agreed to pay for any costs that the bank might incur in liquidating or collecting on any of the collateral. *See* Tr. at 788. No reasonable jury could find that defendant intended to defraud the bank by putting it at risk on the $750,000 line of credit while at the same time remaining personally liable to the bank and maintaining a net worth greater than five times the amount of the line of credit.

### III. Conclusion.

Due to the extensive documentary evidence and complexity of the case, the court deferred ruling on defendant's motion for judgment of acquittal at the close of all the evidence and submitted the case to the jury. The jury returned its verdict finding the defendant not guilty on count 1 and guilty on counts 2 through 6. While the court is always reluctant to disturb a jury's verdict, the court is satisfied in this case that the record evidence is simply insufficient to support the guilty verdict on counts 2 through 6. The court seriously questions that the jury had any real understanding or appreciation based on the evidence presented at trial, or lack thereof, as to whether defendant or Geekie owned each vehicle. Absent the turmoil of trial, the court has now had the opportunity to carefully and meticulously scrutinize the many documents presented at trial and the testimony of the witnesses in light of the applicable law. The court has now determined that it erred in sending the case to the jury. The guilty verdict as to counts 2 through 6 cannot stand and must be vacated and set aside. Accordingly,

IT IS THEREFORE ORDERED that defendant's motion for judgment of acquittal (Doc. # 69) is granted as to all counts; the jury's verdict is set aside and vacated, and the defendant is discharged.